ORIGINAL                                                          ORIGINAL

1  Robert J. Beles bar No. 41993
   Paul McCarthy bar no. 139497
2  One Kaiser Plaza, Suite 2300
   Oakland, California 94612-3642
3  Tel No. (510) 836-0100
   Fax. No. (510) 832-3690

4
   Attorney for *Petitioner*
5  STEVEN ALLEN JONES

6

7

8                    United States District Court
                      Eastern District of California
9

10  STEVEN ALLEN JONES,                    No.

11              *Petitioner*,              PETITION FOR WRIT OF HABEAS
        vs.                                CORPUS; VERIFICATION;
12                                         MEMORANDUM OF POINTS AND
    MIKE MCDONALD, Warden, High Desert     AUTHORITIES
13  State Prison, Susanville, California,

14              *Respondent*.

15  PEOPLE OF THE STATE OF CALIFORNIA,

16              *Real Party in Interest*.

17
              PETITION FOR WRIT OF HABEAS CORPUS
18
            MEMORANDUM OF POINTS AND AUTHORITIES
19

20

21

22

23

24

25

26

27

28

ORIGINAL                                                                    ORIGINAL

# TABLE OF CONTENTS

*item*                                                              *page number*

PETITION FOR WRIT OF HABEAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

    1. Statement of Custody and Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

    2. Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-2

        a. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-2

        b. Pretrial motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-2

        c. Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-2

            i. Prosecution witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-2

                (1) Devon Owen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-2

                (2) Ian Gonzalez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-3

                (3) William Thurman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-6

                (4) Leon Flanagan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-7

                (5) Detective Martin Nawrock. . . . . . . . . . . . . . . . . . . . . . . . p-10

                (6) Lyntasha Barrett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-12

                (7) Deputy Ken Langston. . . . . . . . . . . . . . . . . . . . . . . . . . . . p-12

                (8) Barry Miller. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-12

                (9) Nicole Inacio. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-13

                (10) Barbara Phillips. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-14

            ii. Defense witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-14

                (1) Thomas Chapman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-14

                (2) Michael Tabb. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-14

                (3) Steven Raines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-15

                (4) Leon Flanagan (recalled). . . . . . . . . . . . . . . . . . . . . . . . . . p-16

                (5) Detective Martin Nawrock (recalled). . . . . . . . . . . . . . . p-16

            iii. Defense motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-16

                (1) Inconsistent theories of prosecution. . . . . . . . . . . . . . . . p-16

                (2) Petitioner's travels outside California. . . . . . . . . . . . . . . p-17

i

ORIGINAL                                                                    ORIGINAL

item                                                                    page number

(3) DNA indexes.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-17

(4) Corroboration of accomplice testimony.. . . . . . . . . . . . . p-17

(5) Motion concerning Michael Waxler's testimony. . . . . . . p-17

d. Conviction and motion for new trial. . . . . . . . . . . . . . . . . . . . . . p-18

e. State appellate and post conviction review. . . . . . . . . . . . . . . . . . p-18

3. Claims for relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-19

4. Prayer for relief.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-20

VERIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-20

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . m-1

1. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-1

2. Where the only evidence implicating petitioner in the crimes was the
uncorroborated testimony of an accomplice, petitioner's conviction was
fundamentally unfair and violated his right to a fair trial in violation of his right
to due process of law under the Fourteenth Amendment to the United States
Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-3

a. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-3

b. Evidence claimed to be corroboration. . . . . . . . . . . . . . . . . . . . . m-4

i. Lyntasha Barrett's "identification.". . . . . . . . . . . . . . . . . . . . . m-4

ii. "Steven's" text messager device. . . . . . . . . . . . . . . . . . . . . . . m-4

iii. DNA evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-4

iv. Details of robbery / shooting. . . . . . . . . . . . . . . . . . . . . . . . . m-5

v. Information that petitioner was in New York and Nevada. . . . . . m-5

vi. Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-5

c. Response - no record evidence corroborated Flanagan's testimony that
petitioner was at the scene of the crime or was the gunman... . . . . . . . . . . m-5

3. Trying petitioner as the gunman where the prosecution had previously tried
Gordon as the gunman, and the evidence was undisputed that there was only one
gunman, violated petitioner's right to due process of law under the Fourteenth
Amendment to the United States Constitution.   . . . . . . . . . . . . . . . . . . . . . m-11

4. Admission of "other crimes" evidence violated petitioner's right to due process
of law... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-13

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

*item*                                                            *page number*

5. Instructing the jury that it could find that petitioner fled and infer consciousness of guilt from that finding, where there was no evidence of flight except for the accomplice Flanagan's testimony, violated petitioner's due process rights....... m-13

6. Defense counsel was ineffective in failing to object on confrontation grounds to the trial court's ruling that Gordon's previous testimony accusing appellant of the crime could be introduced if Michael Waxler testified, and in failing to call Waxler.................................................... m-14

7. Error, considered cumulatively, violated petitioner's due process rights...... m-15

8. Conclusion................................................ m-15

ORIGINAL                                                                ORIGINAL

1                                    TABLE OF AUTHORITIES

2    *cases*                                                             *page number*

3    *Birt v. Superior Court* (1973) 34 Cal.App.3d 934 . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-7, m-8

4    *Bowen v. Roe,* 188 F.3d 1157 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-2

5    *Clay v. United States*, 537 U.S. 522 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-2

6    *Crawford v. Washington*, 541 U.S. 36; 124 S. Ct. 1354;
     158 L. Ed. 2d 177 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . .   p-18, p-19, m-14, m-15

7
     *Estelle v. McGuire*, 502 U.S. 62, 116 L. Ed. 2d 385, 112 S. Ct. 475 (1991). . . . . . . . . . .   m-3

8
     *Garceau v. Woodford,* 275 F.3d 769 (9th Cir. 2001.) . . . . . . . . . . . . . . . . . . . . . . . . .   m-13

9
     *Hicks v. Oklahoma*, 447 U.S. 343, 346, 65 L. Ed. 2d 175,
10   100 S. Ct. 2227 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-3, m-14

11   *In re Sakarias* (2005) 35 Cal. 4th 140. . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-11, m-12

12   *Jammal v. Van de Kamp*, 926 F.2d 918 (9th Cir.1991). . . . . . . . . . . . . . . . . . . . . . . .   m-13

13   *Laboa v. Calderon*, 224 F.3d 972 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . .   m-3

14   *McKinney v. Rees,* 993 F.2d 1378 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . .   m-13

15   *Mikes v. Borg*, 947 F.2d 353 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-7, m-8

16   *People v. Abilez* (2007) 41 Cal.4th 472. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-4

17   *People v. Bean* (1988) 46 Cal.3d 919. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-8

18   *People v. Belton* (1979) 23 Cal. 3d 516. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-15

19   *People v. Creegan* (1898) 121 Cal. 554. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-15

20   *People v. Falconer* (1988) 201 Cal. App. 3d 1540. . . . . . . . . . . . . . . . . . . . . . . . . .   m-4

21   *People v. Fauber* (1992) 2 Cal. 4th 792. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-3

22   *People v. Hall* (1934) 220 Cal 166. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-10

23   *People v. Jones*, (1991) 53 Cal. 3d 1115. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-10

24   *People v. Luker* (1965) 63 Cal.2d 464. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-4, m-6

25   *People v. Mason* (1991) 52 Cal.3d 909 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-10

26   *People v. Mendoza* (2000) 24 Cal 4th 130. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-10

27   *People v. Morton* (1903) 139 Cal. 719. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-4

28   *People v. Reingold*, 87 Cal.App.2d 382. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-4, m-7

1  | *cases*                                                          *page number*

2  | *People v. Robbins*, 171 Cal. 466. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-7

3  | *People v. Robinson* (1964) 61 Cal.2d 373. . . . . . . . . . . . . . . . . . . . . . . . . . . . m-4, m-6-8

4  | *People v. Rodrigues* (1994) 8 Cal.4th 1060. . . . . . . . . . . . . . . . . . . . . . . m-4, m-9, m-10

5  | *People v. Santo,* 43 Cal.2d 319. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10, m-11

6  | *People v. Scofield* (1971) 17 Cal.App.3d 1018. . . . . . . . . . . . . . . . . . . . . . . . . . . . m-15

7  | *People v. Shaw* (1941) 17 Cal. 2d 778. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-4

8  | *People v. Szeto* (1981) 29 Cal.3d 20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-4

9  | *People v. Tewksbury* (1976) 15 Cal.3d 953. . . . . . . . . . . . . . . . . . . . . . . . . . . . m-3

10 | *Schell v. Witek,* 218 F.3d 101 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-8

11 | *Smith v. Groose* 205 F.3d 1045 (8th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . m-11

12 | *Taylor v. Stainer,* 31 F.3d 907, 908-910 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . m-8

13 | *Thomas v. Hubbard,* 273 F.3d 1164 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . m-15

14 | *Thompson v. Calderon,*120 F.3d 1045 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . m-11

15 | *United States v. Necoechea*, 986 F.2d 1273 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . m-3

16 | *Zepeda v. Walker*, 581 F.3d 1013 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . p-2

17 |

18 | *statutes and rules*                                              *page number*

19 | California Evidence Code section 355. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-13

20 | California Penal Code section 187(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

21 | California Penal Code section 211. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

22 | California Penal Code section 664/187(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

23 | California Penal Code section 1111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-19, m-9

24 | California Penal Code section 12022.7(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

25 | California Penal Code section 12022(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

26 | United States Constitution, Fourteenth Amendment . . . . . . . . . . . . . . . p-19, m-3, m-11-15

27 | United States Constitution, Sixth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . p-19, m-14

28 |

United States District Court
Eastern District of California

STEVEN ALLEN JONES,                              No.

            *Petitioner*,                        PETITION FOR WRIT OF HABEAS
        vs.                                      CORPUS

MIKE MCDONALD, Warden, High Desert
State Prison, Susanville, California,

            *Respondent*.

PEOPLE OF THE STATE OF CALIFORNIA,

            *Real Party in Interest*.

### PETITION FOR WRIT OF HABEAS CORPUS

Comes now petitioner, by and through counsel undersigned, and petitions for a writ of habeas corpus.

### 1. Statement of Custody and Jurisdiction

1. On May 19, 2006, petitioner was convicted of 1 count of first degree murder with special circumstances, California Penal Code section 187(a), one count of attempted murder, California Penal Code section 664/187(a), and one count of second degree robbery, California Penal Code section 211. Three enhancements were also found true: 1 enhancement for California Penal Code section 12022(1) and 2 enhancements for California Penal Code section 12022.7(a). The court imposed life without parole for the murder, life with parole, consecutively, for the attempted murder, and 12-life for the second degree robbery, consecutively. The court also imposed two of the three enhancements for an additional consecutive term of 50 years, and stayed one of the enhancements. Petitioner is presently in the custody of Mike McDonald, Warden, High Desert State Prison, 475-750 Rice Canyon Road, Susanville, California 96127.

2. Petitioner's petition for review on direct appeal was denied by the California Supreme Court on October 28, 2008. Petitioner has one year plus 90 days to file a federal habeas corpus petition, making the due date for the federal habeas corpus petition January 26, 2010. See

ORIGINAL                                                                 ORIGINAL

1    *Zepeda v. Walker*, 581 F.3d 1013, 1016 (9th Cir. 2009), citing *Bowen v. Roe,* 188 F.3d 1157 (9th

2    Cir. 1999); *Clay v. United States*, 537 U.S. 522, 531 (2003.) This habeas corpus petition has

3    been filed on or before January 26, 2010 and is thus timely.

### 2. Statement of Facts

### a. Introduction

6        3. Petitioner Steven Jones and David Jones, two unrelated individuals with the same last

7    name, were tried for stealing four pounds of marijuana, the murder of John Jarvis, and the

8    attempted murder of Ian Gonzalez. James Gordon and Leon Flanagan had also been charged

9    with the same crimes. Gordon was convicted of murder as an accessory in a prior trial, and

10   Flanagan testified as a prosecution witness in petitioner's trial.

### b. Pretrial motions

12       4. Petitioner moved to strike the gun use enhancements because the prosecutor had earlier

13   tried to prove that Gordon was the gunman. (Reporter's Transcript ("RT.") vol. 1. p. 637.)

14   Evidence showed that only one person fired the shots, and Gordon had admitted doing so. (RT.

15   vol. 1 p. 639.) The court denied the motion because Gordon's jury had not found him to be the

16   gunman. (RT. vol 1. pp. 640, 642.)

### c. Trial.

### i. Prosecution witnesses

### (1) Devon Owen

20       5. Devon Owen and her boyfriend, John Jarvis, lived in Weaverville, Trinity County,

21   California. After she and Jarvis had been laid off from their jobs with Trinity Rafting Company,

22   Jarvis cultivated and grew about four pounds of marijuana which he hoped to sell. On the

23   morning of November 2, 2003, Ian Gonzalez, a friend of Jarvis, called to say that he had found

24   buyers and that they were to meet at a rest area on Route 299. (RT. vol. 3 pp. 676 to 678, 684.)

25   On the way to the meeting, Gonzalez told Owens and Jarvis that his father, William Thurman,

26   was suspicious of the deal and would be at the scene with a radio and a gun. (RT. vol. 3 pp. 682

27   and 683.)

28       6. Owen, Jarvis and Gonzalez met the potential buyers, four African American men in a

green car, at the rest area on Route 299. (RT. vol. 3 pp. 684 to 687.) Owens saw Gonzalez'

father, Thurman, parked on the other side of the parking lot with the hood up on his Bronco as

if he was repairing it. (RT. vol. 3 pp. 692 to 694.)

7. David Jones got out of the car. The other three men remained inside. Gonzalez talked

to David Jones while Owens and Jarvis walked to the bathroom at the rest area. When they

returned, Gonzalez told them that the four men wanted to conduct the buy elsewhere because

there were too many people in the rest area. (RT. vol. 3 pp. 692 to 694.) Gonzalez then went

over to Jarvis to give him directions. (RT. vol. 3 pp. 696-697.)

8. Owens then heard voices from the car repeatedly saying, "Just do it. Go get it." Then

the rear passenger car door, nearest her, opened. David Jones got out and walked around the

back of the truck. (RT. 695.) Owens yelled to Jarvis and Gonzalez that the marijuana was about

to be stolen. Jarvis turned and started to run back to the truck. David Jones then grabbed the

marijuana out of Jarvis' truck, ran to the green car, and jumped into it. (RT. vol. 3 pp. 696-697),

The green car then sped out of the parking area toward Weaverville. (RT. vol. 3 p. 699.)

9. Jarvis and Gonzales jumped into Jarvis's truck pulled up beside Owens. Owens refused

to go with them. Jarvis told Owens to wait until they returned. Jarvis and Gonzalez's truck then

pulled out of the rest area, closely followed by Thurman's vehicle. (RT. vol 3. pp. 700 and 701.)

Owens waited over an hour for the two to return and then got a ride to a friend's house. She

learned that Jarvis had been killed the following day. (RT. vol. 3 pp. 703 and 704.)

10. Owens later identified David Jones as one of the four men in the green car from

various line-ups and in court, but was unable to identify any of the other three men. (RT. vol.

3 pp. 715, 716, 725, 728.)

### (2) Ian Gonzalez.

11. Ian Gonzales lived in Big Flat, Trinity County, California with his father, William

Thurman. He and his father were employed as highway construction workers and Gonzalez also

sold and cultivated marijuana. (RT. vol. 3, pp. 794 and 795.) Jarvis was employed by the rafting

company next door to where Gonzalez lived. Gonzalez had met Jarvis and Owens in the summer

of 2001, and regularly socialized with Jarvis. (RT. vol. 3. p. 796.)

12. On the evening of November 1, 2003, Gonzalez had gone to a rap concert in Eureka, California, and while there, met some people from the Bay Area who wanted to buy a large amount of marijuana. (RT vol. 3 pp. 797-799.) Jarvis had told Gonzalez a few days before that he had four pounds of marijuana that he he wanted to liquidate. (RT. vol. 3 p. 800.) The people wanted to buy five pounds of marijuana for $12,000 - $15,000. (RT. vol. 3 p. 800.) About three to four individuals negotiated with him. (RT vol. 3 p. 802.)

13. Gonzalez spent the night in Eureka. He then drove back to the Weaverville area and called Jarvis at about 11:00 am on November 2, 2003 to tell him that Gonzalez had found some buyers for the marijuana. (RT. vol. 3 pp. 803 and 804.)

14. Gonzalez had previously arranged with his father, Thurman, to be at the at the rest area with a rifle to provide backup. (RT. vol. 3 pp. 806 and 807.) When Gonzalez, Jarvis, and Owens got to the rest area, four African-American men were parked in a green Taurus, waiting for them. Jarvis parked next to them. The car had no tinted windows, so Gonzalez could see inside. He recognized David Jones as one of the men as the person he had negotiated the deal with in Eureka, but did not recognize the three others. (RT vol. 3 pp. 808-811.)

15. David Jones got out of the car and discussed the proposed drug deal with Gonzalez while sharing a sample of the marijuana that Gonzalez had brought. (RT. vol. 3. p. 811.) David Jones walked around to the back of Jarvis's truck with Gonzalez to look at the marijuana and then told Gonzalez that the four wanted to conduct the sale at another location because there were other people in the rest area. (RT. vol. 3. pp. 812-813.) Gonzalez walked up to the driver of the green car, who rolled down the window, and gave him directions to the alternate location. (RT. vol. 3. pp. 814.)

16. Gonzalez then saw David Jones grab the marijuana and run to the green car. Jarvis ran from the bathroom area of the rest stop and tried to grab the marijuana out of David Jones' hands, but was unable to do so. The green car dragged Jarvis for about 10 or 12 feet, until Jarvis let go and rolled to the ground, and then exited the parking lot at a high rate of speed. (RT. vol. 3 pp. 817 to 819.)

17. Jarvis got up and ran to his truck, shouting, "Let's get them." The car turned east

ORIGINAL                                                                    ORIGINAL

1   towards Redding, while gathering velocity. They jumped into Jarvis's truck, Jarvis driving, and

2   followed the green car. Gonzalez saw his father, Thurman, shut the hood of his car as they

3   passed him. Gonzalez radioed Thurman and told Thurman that the four men had stolen the

4   marijuana. Thurman then got in his car and followed them. (RT. vol 3. pp. 820-824.)

5        18. Jarvis caught up to the green car about two miles from the rest stop and began

6   ramming it with his truck in an attempt to stop it. The green car turned off Route 299 onto a

7   side road near Hawkins Bar. Jarvis rammed the green car about 8-10 times. (RT. vol 3 pp. 823

8   and 824.) Jarvis's truck then hit the rear corner of the green car and spun the car around, but

9   Jarvis's truck went off the road and got stuck in a ditch. Jarvis drove his truck out of the ditch,

10  passed the green car, sideswiping it, and then tried to back his truck into the green car. (RT. vol.

11  3 pp 828 and 829.) One of the four men then jumped out of the car, got a black revolver out of

12  the trunk, and fired five to six shots at Jarvis' truck from a distance of about three to five feet.

13  (RT. vol 3. pp. 830.) Two of the shots hit Gonzalez in his upper back. The green car then sped

14  west towards Route 299. Jarvis' truck slowed to a stop and Jarvis appeared to be losing

15  consciousness. (RT. vol. 3. pp. 830, 833-834.) Gonzalez described the gunman as 6 feet 4 inches

16  tall and weighing 250 lbs. (RT. vol. 3 pp. 855, 856, 894.)

17       19. Gonzalez radioed Thurman, told him that he and Jarvis had been shot and asked

18  Thurman to "kill them." By radio, he told Thurman that he and Jarvis were shot and asked

19  Thurman to "kill them". (RT. vol 3. pp. 835 and 836.) In less than two minutes, he heard two

20  gunshots and saw the green car return and speed past him. (RT. vol 3. pp. 837.) Gonzalez then

21  radioed Thurman and asked Thurman to pick him up. Jarvis was unresponsive and Gonzalez

22  believed Jarvis was dead. Thurman arrived and took Gonzalez to a friend's house. The friend

23  removed one of the bullets and let Gonzalez stay a few days. Gonzales didn't go to a hospital

24  because the gunshot would have been reported to the police. (RT. vol 3. pp. 839.)

25       20. Gonzalez had seen all four men from a close distance, and so was able to identify

26  Gordon, Flanagan, and David Jones. (RT. vol 3. pp. 843-847.) Gonzalez did not identify

27  petitioner as the fourth man. (RT. 8 vol 3. pp. 49.) Instead, Gonzalez identified a picture

28  developed from a camera found in the green car as the fourth man. (RT. vol 3. pp. 863-864, vol.

ORIGINAL                                                                    ORIGINAL

1    4 p. 901.) The picture was of an uncharged individual, Dwayne Williams. (RT. 864.)

2                                **(3) William Thurman**

3       21. At the time of the shooting, Thurman lived with his son, Gonzalez, in Big Flat. On

4    Saturday, November 1, 2003, Gonzalez and some "local boys in town" went over to the coast

5    (Eureka) to go to a concert. Thurman saw his son Sunday morning on November 2, 2003, and

6    overheard Gonzales' phone conversation with Jarvis. (RT. v. 4 p. 907.) When Thurman asked

7    what was going on, Gonzalez told him that Jarvis had pounds of marijuana and was planning to

8    sell it to "out-of-town people", "African-American fellows" from Vallejo. Thurman was upset

9    because this marijuana sale was not taking place in the "usual manner", in the "kitchen or front

10   room", among friends. (RT. v. 4 p. 908 to 909.) He advised Gonzalez not to go through with

11   the sale, but Gonzalez told him that he would do it anyway. Thurman then drove his car to the

12   meeting place about an hour before, bringing his rifle and a two way radio with him. (RT. vol.

13   4 p. 910 to 911.)

14      22. After Thurman got to the rest area, he saw a green car with four African-American

15   men inside arrive. He assumed that they were Gonzalez' customers. There was a group of

16   Caltrans workers working in the rest area, and about a half a dozen tourists or cars. (RT. vol. 4

17   p. 912-914.) Gonzalez, Jarvis, and Owens then arrived. Jarvis' truck and the green car were

18   parked about 30-35 yards away from where Thurman was parked. Thurman saw Owen walk

19   toward the restroom, Gonzales walk to the rear of Jarvis' truck, and all four men get out of the

20   green car, walk to the back of Jarvis' truck, and look into the truck bed, where Gonzalez was

21   opening a black garbage bag. (RT vol. 4. pp. 915-916.)

22      23. Thurman then saw movement and confusion coming from the four men standing

23   outside the truck. One of them grabbed the black garbage bag from the back of the truck, and

24   they all ran for the green car, jumped in it, and began to drive away. Jarvis and Gonzalez chased

25   the green car on foot, then got into Jarvis' truck and drove after the green car. (RT. vol. 4 p.

26   916.) Thurman shut the hood of his car and followed Jarvis and Gonzalez. He then received a

27   radio call from Gonzalez that the green car had turned off onto Denny Road. (RT. vol. 4, p.

28   919.)

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

24. As Thurman was driving down Denny Road, he received a second radio call from Gonzalez, who said that "these fellows from out of town had shot" him and Jarvis. Gonzalez told Thurman that the green car was coming towards him and Hawkins Bar. (RT. vol. 4 p. 920.) He then saw the green car approaching him on the other side of a bridge. When the men in the car saw him, they stopped, got out of the car, went to the trunk, and one of the men waved a pistol at Thurman. Thurman decided to stop the car by shooting a hole in its radiator with his rifle. (RT. vol. 4 p. 922 and 923.) Thurman fired; the green car stopped, turned around, and drove back towards where Gonzalez had gone. Thurman radioed Gonzalez and told him that the green car was coming back and to hide. (RT. vol. 4 p. 924.) Thurman then drove in the direction that the green car had gone and picked up Gonzalez. Gonzales told him that a fish and game warden had taken over the chase. (RT. vol. 4 p. 925.) When Thurman suggested that he take Gonzalez to a hospital. Gonzales panicked, and had Thurman drive him to a place in the Red Bluff area. Thurman then disposed of his rifle in Lake Shasta, took his gun on the boat and threw it away. (RT. vol. 4 p. 927.)

25. Thurman was unable to identify any of the four men in the green car.

**(4) Leon Flanagan**

26. Flanagan, one of the four men in the green car, testified for the government in exchange for a negotiated plea to voluntary manslaughter with a sentence of six years, plus four years for possession of a weapon. (RT. vol. 5, p. 1275.)

27. Flanagan said that he met petitioner in August or September at Sound Waves Studio and David Jones on November 1, 2003. Petitioner told Flanagan that he was part of a rap group called "Fatal Connection." (RT. vol. 4 p. 1168.) Flanagan only knew petitioner by his nickname, "Steven O" and rap name, "Kamikazi." (RT. vol. 4 p. 1169.) Flanagan knew David Jones only by his nickname of "D" or "Dame." (RT. vol. 4, p. 1176.)

28. In September of 2003, Flanagan and petitioner talked over the phone and in person about going to Eureka to hear the rap group E40. They left in Flanagan's father's green Ford Taurus at about 4:00 P.M.. (RT. vol. 4, pp. 1172 to 1174.) David Jones was with Steven Jones when Flanagan picked them. Flanagan had also brought James Gordon to drive the car.

29. They left for Eureka around 4:45 or 5:00. Flanagan thought it would be a three to four hour drive. He claimed that the after party promoter, "Big V," had arranged for Flanagan to perform a song at an after-event party at Club West. (RT. vol. 4, pp. 1179 and 1180.) The four arrived at Eureka between 11:45 and 12:00 P.M. after driving six hours. They could not get into Club West. (RT. vol. 4, pp. 1182.) They went to a Super 8 Motel. James got a room at the motel that the four shared (RT. vol. 4, pp. 1185.) Petitioner had a wad of bills in his front pocket. (RT. vol. 4, pp. 1186.) Flanagan had told detective Jarbo that Steven had about 35 to 45 hundred dollar bills in the wad. (RT. vol. 4, pp. 1189.)

30. Petitioner or Gordon suggested traveling on Highway 299 on the return trip, which would bring them to Vallejo via Sacramento, because Gordon lived in Vallejo. They stopped at a rest area about one hour away from Eureka. (RT. vol. 4, pp. 1199.) Gordon was still driving. About five minutes later, a truck pulled in beside them. Gonzales, petitioner and David Jones got out. Gonzales pulled "weed" out of his ear and started smoking with them. (RT. vol. 5, pp. 1204 and 1205.) Petitioner returned to the car and got in behind Gordon. Gonzales walked toward the two people, Jarvis and Owen, who had come with him. David Jones, "acting sneaky," went around to the other side of the truck, took a black bag out of the back, returned to the car and got in behind him (RT. vol. 5, pp. 1207 to1209) and said, "Let's go." David had a quarter full Glad Bag trash bag, about 18 in. by 24 in. by 12 in., with him in the car. (RT. vol. 5, pp. 1210 and 1211.)

31. Through his rear-view mirror, Flanagan saw Jarvis standing in the middle of the parking area, looking puzzled, as the car started off. (RT. vol. 5, pp. 1212 and 1213.) Once on Highway 299, he noticed a Bronco, which had been parked near their car at the rest area, following the car. (RT. vol. 5, p. 1213.)

32. Then, Jarvis and Gonzales in the pickup truck passed the Bronco, and got behind their car. Gonzales leaned out the window and told them to pull over as they sounded the truck horn. (RT. vol. 5, p. 1214.) As Gordon started to pull over, the truck fell behind and rammed the car a few times. Petitioner said to turn left, so they did. The truck turned left and followed them. (RT. vol. 5, pp. 1215 and 1216.)

ORIGINAL                                                                              ORIGINAL

33. After crossing the bridge, the truck rammed the car again, knocking it onto some dirt. The truck got "high centered" on a hill. (RT. vol. 5, p. 1217.) The car went back across the bridge, but was blocked by the Bronco positioned across the road (RT. vol. 5, pp. 1218) at the other end of the bridge. A man got out of the Bronco and pointed a rifle at the car. The car stopped. Flanagan heard one or two gunshots. (RT. vol. 5, pp. 1219 and 1220.)

34. As the truck reversed toward the car again, Gordon tried to start the car and back up, but the transmission was in "drive." He told Gordon to put it in "park" to start the car. Gordon shifted the transmission into "park" and started the car, but could not get the transmission out of "park." "And that is when Steven gets out of the car," said Flanagan. Petitioner went to the back of the car. Flanagan heard five gunshots coming from the back of the car. He ducked down. Petitioner got back in the car with a black revolver in his hand. (RT. vol. 5, pp. 1222-1224.)

35. Half way across the bridge, petitioner stuck a black revolver out the driver's side window as they drove toward the Bronco and tried to fire at the man with the rifle, but the gun was empty and clicked. (RT. vol. 5, pp. 1225 and 1226.)

36. Gordon stopped the car and said he wasn't driving any more. Gordon and petitioner exchanged seats. Petitioner drove past the truck. (RT. vol. 5, p. 1227) He drove fast along Denny Road for a mile or two, until the back tire blew out. (RT. vol. 5, p. 1228.) Steven pulled off to a turnout. He got out to get a spare tire. Flanagan and Gordon walked away from the car, heard a crash, returned, and found the car pushed off the side of the road into a tree and petitioner, David Jones, and the bag of marijuana gone. (RT. vol. 5, pp. 1230 - 1232.)

37. Flanagan and Gordon walked for seven hours (RT. vol. 5, p. 1232) and flagged down the first car they saw, a Trinity County Sheriff's car. When the car stopped, officers came out with guns and bright lights. (RT. vol. 5, p. 1233.)

38. During his initial interview with detective Nawrock, Flanagan didn't mention a shooting. He gave a description of petitioner: (RT. vol. 5, p. 1234) 22 or 23 years old, tall, skinny, no facial hair, clean cut, a "pretty boy," also known as "Steve O." He knew him as "Steve O" or "Kamikaze," but was not sure if he mentioned the name "Kamikaze" during any interview. (RT. vol. 5, p. 1235.) He described David as 23 to 24 years old, with French braids and gold

p-9

teeth, who was also known as "Dame." (RT. vol. 5, p. 1236.)

39. On November 4, 2003, Flanagan told detective Jarbo that other names for "D" were "Dame," "Damian," "Dank," or "Divo." (RT. vol. 5, pp. 1245-1247.)

40. Flanagan identified a cell phone that he saw petitioner use, which had been found in the car. The phone number that he had for "Steve O" may have gone with that cell phone. (RT. vol. 5, p. 1253.)

41. Questioned about Dwayne Williams, Flanagan admitted that he had known Williams since junior high school, but insisted that Williams was not one of the four men in the green car. (RT. vol. 5, p. 1260.) Flanagan admitted making calls to Dwayne Williams in the first few days he was in custody. (RT. vol. 5, p. 1355.)

42. Flanagan had assured the sheriffs that the fingerprints of David Jones and petitioner could be obtained from the CD player, CD cases and CD's found in the car because they had been handling these items. (RT. vol. 5, p. 1351.) [1]

### (5) Detective Martin Nawrock

43. Sheriff Nawrock was the lead investigator in the case who interviewed Gordon and Flanagan. (RT. vol. 6 p. 1522.)

44. Owen did not recognize pictures of Gordon or Flanagan in the photo lineups. Gonzales identified Gordon in one photo lineup (RT. vol. 6 pp. 1535 to 1537) and Flanagan in the other. (RT. vol. 6 p. 1538.) Later, Nawrock showed Gonzalez photos that had been developed from the disposable camera found in the back of the green car. Gonzalez recognized a man in one of the photos, Dwayne Williams, as one of the four individuals in the car. Based on that identification, Williams was arrested in Richmond. (RT. vol. 6 pp. 1541 to 1544.) They then interviewed April Flanagan, drove to a record shop and purchased a copy of the "Fatal Konnection" cassette tape. Based on the tape, they determined that Steven and David Jones were members of the band. (RT. vol. 6 p. 1547) Williams was released a few days later. (RT. vol. 6 pp. 1548 and 1549.) They looked for Steven and David Jones through December in areas around

---

[1] None of petitioner's fingerprints were, in fact, recovered from any item in the car. See discussion of fingerprint technician Barbara Phillips's testimony at p. 13 of the petition.

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

ORIGINAL                                                                              ORIGINAL

Richmond, but weren't able to find either. (RT. vol. 6 pp. 1550 to 1553.)

45. David Jones was arrested in Richmond on January 8, 2004. He told Nawrock that he wasn't the person who did the shooting. Gonzales later identified David Jones from a photo lineup on December 1, 2004. (RT. vol. 6 p. 1565.)

46. They returned to Richmond on March 3, 2004, in an attempt to locate and arrest petitioner, and spoke to petitioner's father for the first time on March 4, 2004. They could not find him. (RT. vol. 6 pp. 1569 and 1570.) In May 2004, they received information from the Auburn Police Department in New York about petitioner being booked under the name "Michael Griffith." On May 22, 2004, the Henderson County Police Department in Las Vegas, Nevada reported having "Michael Griffith" in custody. On May 24, 2004, Nawrock went to Nevada and determined that Griffith was Steven Jones. (RT. vol 6 pp. 1571-1573.)[2]

47. On July 13, 2004, Nawrock and his deputies gathered items from inside the Taurus, including a green and white baseball cap, white head wrap, dread lock wig, and yellow raincoat. The items were taken to the Department of Justice on July 15, 2004. (RT. vol 6 p. 1574.)

48. Flanagan identified Steven Jones from a photo lineup on July 16, 2004. (RT. vol. 6, pp. 1574 and 1576.)

49. During cross-examination, petitioner's counsel inexplicably asked detective Nawrock whether anyone besides Flanagan **and Gordon** had identified petitioner as having been in Trinity County at any time. There was no evidence in the record that Gordon had identified anyone, no statement of Gordon's introduced into evidence, Gordon never testified in petitioner's trial. The prosecutor objected on the grounds that there had been no testimony about Gordon identifying anyone. Detective Nawrock replied that nobody, except Flanagan and Gordon, has identified petitioner as having been in Trinity County at any time. No further details were introduced concerning Gordon's alleged identification of petitioner, or even whether Gordon actually identified petitioner. (RT. vol. 6, p. 1585.)

---

[2] The court instructed the jury at that point that the testimony from Detective Nawrock regarding his contacts with New York and Nevada, and what others told him about petitioner, is not to be considered for the truth of what was stated, but only to explain why he arrested petitioner in Henderson, Nevada. (RT. v. 6 p. 1571 to 1573.)

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

ORIGINAL                                                                    ORIGINAL

50. Detective Nawrock admitted that Gonzalez had identified Dwayne Williams as one of the four men in the car, but had never said he was 100% positive. (RT. vol. 6, p. 1588.) Nawrock didn't show Williams' photo to Owens or any of the other witnesses. (RT. vol. 6, pp. 1589 to 1590.)

51. Nawrock said that Michael Waxler had testified in Gordon's trial about a statement Gordon allegedly made. He did not mention what Waxler had said. (RT. vol. 6, p. 1610.)

### (6) Lyntasha Barrett

52. Barrett went to the E40 concert in Eureka on November 1, 2003, and to the after-party at Club West. (RT. vol. 6, p. 1612 and 1613.) She was briefly at the Super 8 motel. Nawrock showed her four photos. She couldn't identify any of them as people she'd seen in Eureka, but she told Nawrock that she'd seen someone with eyes similar to one of the men in the photos, and seen someone with braids similar to another of the men in the photos. (The two photos were of David Jones and petitioner.) (RT. vol. 6, p. 1613 and 1614.) Barrett was unable to identify either petitioner or David Jones in court. (RT. vol. 6 pp. 1619 and 1620.)

### (7) Deputy Ken Langston

53. Deputy sheriff Langston collected three phones from Flanagan, a phone in the name of Inez Taylor, and a text-messager from the green car. He powered the phones up and downloaded information from their phone books. There were phone address book entries for "Steve O." The phone number of "Steve O" was stored in the text-messager. There were phone calls made back and forth between the phones.

54. Sonia Stevenson of Richmond owned the text-messager. The Kyocera cell phone was owned by "Peon Flanagan" of Richmond. (RT. vol. 6 pp. 1636 to 1639.) Leon Flanagan's brother's name is "Teon Flanagan." Of the other two cell phones, one was in the name of Stefan Williams of Vacaville, and the other was in the name of Mark Mendoza of Richmond. He was not able to locate these individuals. The accounts for the phones were fraudulent. (RT. vol. 6 p. 1640.)

### (8) Barry Miller

55. Miller worked for the State Department of Justice's crime laboratory in Redding. He

collected and field tested various items of evidence in the case. Miller acknowledged that the Department of Justice was capable of conducting gunshot residue tests and admitted that no gunshot residue test was performed on either Flanagan or Gordon to determine whether either had fired a gun on the day of the shooting. (RT. vol. 7 pp. 1829-1832.)

### (9) Nicole Inacio

56. Inacio, a DNA technician with the State Department of Justice, conducted DNA testing on various items of evidence obtained from the green car by Miller. She found Steven Jones' DNA on various items of evidence from the car (RT. vol. 7 p. 1861.) These included a white head wrap containing DNA of Steven Jones and two unknown individuals, (RT. vol. 7 pp. 1899 and 1900), a baseball cap containing DNA of Steven Jones and two unknown persons, (RT. vol. 7 pp. 1904 to 1906), and a stain on the car seat (Steven Jones only, RT. vol. 7 pp. 1882 and 1883.) She matched the DNA to Steven Jones by comparing it to DNA in a blood sample taken from Jones (RT. vol. 7 pp 1884) and DNA profiles from the state and national felony indexes.

57. Inacio couldn't tell how old the DNA samples were, or when the stain might have been deposited. (RT. vol. 7 pp. 1872 to 1874.)

58. On September 2, 2004, when Inacio uploaded the DNA profile from the samples taken in the car to the California state felony database, it matched an unknown profile from Contra Costa County. When the profile was loaded to the national felony database, it matched a profile from the Las Vegas Metropolitan Police Department. (RT.vol. 7 pp. 1882 and 1883.)

59. On September 20, 2004, Inacio drove to Contra Costa County to obtain a blood sample from petitioner. (RT. vol. 7 pp. 1884.) When tested, petitioner's DNA matched the DNA obtained from the stain in the back seat of the car, the head wrap, and green cap, indicating to her that he had been in the back seat of the car and had worn the head wrap and green cap at some time in the past. At least two other people had worn the head wrap and green cap as well. Inacio could conclude nothing further. (RT. vol. 7 p. 1942.)

### (10) Barbara Phillips

60. Phillips, a fingerprint technician with the State Department of Justice, examined various items for fingerprints. Flanagan's prints were on CD's, on a CD container, and on a

p-13

ORIGINAL                                                                                                ORIGINAL

"Nextel Users Guide" and box. The younger and older James Gordon's fingerprints were on a "Robin" CD found in the trunk of the car. The younger James Gordon's fingerprint was on a CD container. David Jones' prints were found on the map. (RT. vol. 7 pp. 1992.) Jasmine Colbert's fingerprint was on the CD, "All Eyes on Me." (RT. vol. 7 pp. 2003 and 2004.) Petitioner was eliminated as the maker of all of the prints. (RT. vol. 7 pp. 2006 to 2008.)

### ii. Defense witnesses

#### (1) Thomas Chapman

61. Chapman is the director of organization that provides counseling for domestic violence and anger management. Petitioner attended the domestic violence and anger management group for men, run by facilitator Michael Tabb, which began at 6:00 p.m. on Monday nights in El Cerrito. (RT. vol. 7. p. 2054.)

62. A sign-in sheet is provided for the participants to sign after paying their money. After each participant signs in, the facilitator signs off signifying that the participant is present and has paid.   Chapman reviewed the sign-in sheets. Petitioner had been regularly attending including the night of November 3, 2003.[3] Petitioner was dropped from the program on December 15, 2003 because he had too many absences. (RT. vol. 7. pp. 2055 to 2057.)

#### (2) Michael Tabb

63. Tabb worked as a facilitator for the organization. He recognized petitioner as someone who had attended the domestic violence and anger management group for men, held Monday nights at 6:00 pm. Tabb never signs off until he has collected the money and the participant has signed in. (RT. vol. 7. pp. 2067 and 2068.)

64. In the past, participants had claimed they had paid, when they hadn't, so Tabb developed his system for signing in. He didn't positively recognize petitioner's signature, but Tabb had signed off on it (RT. vol. 7. p. 2069), and was sure that the signatures were petitioner's. (RT. vol. 7. pp. 2077 to 2079.) Petitioner had signed the sheet on November 3, 2003. (RT. vol. 7. pp. 2070 and 2071.) There is no way someone could have pretended to be

---

[3] The dates petitioner attended the class were September 15 and 22, 2003, October 13, 20, and 27, 2003, November 3, 10, 17, and 24, 203, and December 1, 2003. (RT. vol. 7. pp. 2055 to 2057.)

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

ORIGINAL                                                                        ORIGINAL

1   petitioner and sign in for him. He doesn't remember petitioner appearing fatigued, under stress,

2   disheveled or unkempt in class. (RT. vol. 7. p. 2072.)

3       65. The prosecutor asked Tabb if he would be surprised to learn that petitioner was in

4   custody in Los Angeles on October 20, 2003. The defense objected that the prosecutor was

5   assuming facts not in evidence. Tabb answered that he would be surprised and confused. The

6   court held an unreported sidebar discussion and the prosecutor thereafter did not continue to

7   ask Tabb about petitioner allegedly being in Los Angeles on October 20, 2003, nor was any

8   evidence introduced on rebuttal that petitioner was in fact in Los Angeles on that date. (RT. vol.

9   7. p. 2074.)

10                                    **(3) Steven Raines**

11      66. Steven Raines was a former detainee who had been in jail with the prosecution's chief

12  witness, Flanagan. Outside the presence of the jury, Raines said he told petitioner's counsel

13  information about what Flanagan told him in the jail, but now did not want to testify, because

14  two law enforcement officers and a prosecutor from the same office as the trial prosecutor visited

15  him over the weekend (RT. vol. 8, p. 2218) and told him that he'd go to prison if he testifies

16  falsely. (RT. vol. 8, p. 2220.) He told the officers he had nothing to say. (RT. vol. 8, p. 2222.)

17  Asked if Flanagan had told him that petitioner was not at the shooting scene, Raines refused to

18  answer. The court ordered him to answer or he'd be jailed for contempt of court. (RT. vol. 8,

19  p. 2223.) Raines then said that since he's being forced to testify, he did tell petitioner's counsel

20  that when he was in jail with Flanagan, Flanagan told him that "Jones across the hall" wasn't

21  there, that it was a "setup," and that Jones was a "fall guy." (RT. vol. 8, pp. 2223-2224.)

22  Flanagan told him the same thing three or four times in the three months they were locked up

23  together. (RT. vol. 8, p. 2224.) Flanagan also told Raines that he had been having sex with

24  petitioner's "baby mama" before he was arrested. (RT. vol. 8, p. 2224.) Raines identified "Jones

25  across the hall" as petitioner. (RT. vol. 8, p. 2225.)

26      67. Raines then testified before the jury, stating that was in the same pod with petitioner

27  and Flanagan. (RT. vol. 8, p. 2238.) Flanagan had told him, three or four times, that petitioner

28  (Steven Jones) wasn't present at the robbery - shooting and was a "fall guy." (RT. vol. 8, p.

2239.) Flanagan said that Jones didn't know that he had "banged" petitioner's "baby mama." (RT. vol. 8, p. 2240.)

### (4) Leon Flanagan (recalled)

68. Flanagan, recalled as a defense witness, admitted that Raines was in the same pod as him, but insisted that he'd never talked to Raines, never told him that petitioner wasn't present at the shooting and that he was using petitioner as a "fall guy", and never told Raines that he had had sex with petitioner's "baby mama." (RT. vol. 8, p. 2230.) Flanagan admitted knowing who the "baby mama" was (RT. vol. 8, p. 2231), and that Raines had been trying to get Flanagan to talk about the case. (RT. vol. 8, p. 2233.)

69. Flanagan had decided not to talk about his case to other inmates because Gordon had told Waxler something and Waxler became a jailhouse informant and testified against Gordon at his trial in November of 2004. (RT. vol. 8, p. 2232.) Asked how he knew this, Flanagan responded that he'd seen transcripts of Gordon's trial and knows that Waxler testified that Gordon told him that Gordon had shot Jarvis. (RT. vol. 8, p. 2234.)

### (5) Detective Martin Nawrock (recalled)

70. Nawrock admitted that the "Steve O" in Flanagan's phone book was Sonya Steverson's number. (RT. vol. 8, p. 2265.) The local authorities didn't do gunshot residue tests on Gordon or Flanagan on the night they were arrested because he was told by the State Department of Justice that they don't do the test anymore. Nawrock has heard of gunshot residue testing but has never used the test in 30 years of investigations. (RT. vol. 8, p. 2266.)

### iii. Defense motions

### (1) Inconsistent theories of prosecution

71. Petitioner's counsel moved for a mistrial because of Flanagan's statements that petitioner was the gunman, which were inconsistent with the prosecution's theory, at Gordon's trial, that Gordon was the gunman. The court denied the motion, again relying on the fact that Gordon had not been convicted of being the gunman. (RT. vol. 5, p. 1319.)

### (2) Petitioner's travels outside California.

72. Petitioner's counsel also moved to bar evidence that petitioner had left the state of

California after the shooting and had been arrested in Nevada. In response, the judge instructed the jury that they could not consider Detective Nawrock's information about petitioner's travels for the truth of the matter concerned, but only to explain why Nawrock arrested petitioner in Henderson, Nevada. (RT. vol. 6. pp. 1510 and 1511.)

73. Petitioner's counsel later objected to the flight instruction because there was no evidence that petitioner knew that he was a suspect in this case when he left the state. The court found the flight instruction applicable because petitioner had allegedly fled the scene. (RT. vol. 8, p. 2275.) The court did not instruct the jury, however, that it could only consider evidence that petitioner had fled the scene as evidence of flight.

### (3) DNA indexes

74. Petitioner's counsel objected to evidence that petitioner had DNA profiles in the state and federal felony indexes, since this would show prior arrests or crimes and would be prejudicial. The court denied the motion, since the indexes were relevant toward showing the credibility of DNA evidence. The court did not rule on whether such evidence would be more prejudicial than probative. (RT. vol. 7. p. 1862.)

### (4) Corroboration of accomplice testimony

75. Petitioner's counsel moved to dismiss under California Penal Code section 1181 because of insufficient evidence corroborating the accomplice, Flanagan's, testimony implicating petitioner in the crime. The prosecution argued that the mere evidence that Steven Jones was in the car at some time was sufficient corroboration. (RT. vol. 7. pp. 2031 and 2032.) The court denied the motion. (RT. vol. 7 p. 2033.)

### (5) Motion concerning Michael Waxler's testimony

76. Petitioner's counsel told the court he wanted to introduce Michael Waxler's prior trial testimony, or live testimony, that Gordon had confessed to Waxler that Gordon had shot Jarvis. (RT. vol. 8, p. 2159.) Petitioner's counsel did not object to introducing all of Waxler's prior testimony, but objected to introduction of any of Gordon's testimony on hearsay grounds. (RT. vol. 8, pp. 2163-2164.) Petitioner's counsel, however, did not object that Gordon's trial testimony was testimonial hearsay whose introduction would be barred by the Sixth Amendment

confrontation clause because counsel had not had any opportunity to cross-examine Gordon.[4]

77. The prosecutor argued that if Waxler's statements that Gordon told him he shot Jarvis were introduced, he wanted to introduce Gordon's statements that he didn't tell Waxler that he'd shot Jarvis, but that petitioner had shot Jarvis. (RT. vol. 8, pp. 2203.)

78. The court initially decided that it would not allow introduction of prior testimony of Gordon inculpating David Jones, but did not rule on whether Gordon's testimony that petitioner was the gunman could be introduced. (RT. vol. 8, p. 2214.) The court later ruled that Waxler testified or his statement was introduced, the prosecutor could introduce any of Gordon's trial testimony that contradicted what Waxler said Gordon told him, including Gordon's testimony that petitioner was the shooter. In response, petitioner's counsel announced that he would not call Waxler as a witness. (RT. vol. 8, p. 2263.)

### d. Conviction and motion for new trial

79. The jury convicted petitioner. Following the verdict, petitioner's counsel moved for a new trial on the use of inconsistent prosecution theories, intimidation of Raines, and the lack of corroboration that had been previously raised in petitioner's motion for mistrial. Raines submitted a declaration in which, in addition to stating that Flanagan told him petitioner was a "fall guy," gave a detailed description of what had happened. Raines said that the only other person Flanagan had identified as involved was Gordon, and referred to the other two people in the car with generic terms like "partner," "home boy," and "dog." (CT. vol. 2, p. 642). The court denied the motion.

### e. State appellate and post conviction review

80. Petitioner pursued a timely direct appeal and filed state collateral relief proceedings raising the issue of ineffectiveness of counsel.

### 3. Claims for relief

81. Where the only evidence implicating petitioner in the crimes was the uncorroborated

---

[4] See *Crawford v. Washington*, 541 U.S. 36; 124 S. Ct. 1354; 158 L. Ed. 2d 177 (2004). At the time of trial (February 22, 2006 to March 22, 2006, Clerk's Transcript ("CT.") vol. 2, pp. 325, 384, motion re. Waxler occurring on March 20, 2006, CT. vol. 2. p. 383), *Crawford* had been the controlling authority since March 8, 2004.)

testimony of an accomplice, petitioner's conviction in violation of California Penal Code section 1111, which requires corroboration of an accomplice's testimony, rendered his trial fundamentally unfair and violated his right to a fair trial in violation of his right to due process of law under the Fourteenth Amendment to the United States Constitution.

82. Trying petitioner as the gunman where the prosecution had previously tried Gordon as the gunman, and the evidence was undisputed that there was only one gunman, violated petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution.

83. Admission of evidence that petitioner's DNA profile was in state and federal felony indexes, where this was not a "cold hit" case and such evidence proved nothing but the the impermissible fact that petitioner had probably been arrested or convicted for prior felonies and thus had a propensity to commit a crime, rendered his trial fundamentally unfair and violated his right to a fair trial in violation of his right to due process of law under the Fourteenth Amendment to the United States Constitution.

84. Instructing the jury that it could find that petitioner fled and infer consciousness of guilt from that finding, where there was no evidence of flight except for the accomplice Flanagan's claim that he had fled the scene, rendered his trial fundamentally unfair and violated his right to a fair trial in violation of his right to due process of law under the Fourteenth Amendment to the United States Constitution.

85. Trial counsel's failure to object to the proposed introduction of Gordon's trial testimony as impermissible testimonial hearsay under *Crawford v. Washington* was ineffective, in violation of petitioner's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution.

86. All of these errors combined rendered petitioner's trial fundamentally unfair and violated his right to due process under the Fourteenth Amendment to the United States Constitution.

### 4. Prayer for relief

Wherefore, petitioner prays that, following an evidentiary hearing as may be necessary on the ineffectiveness of counsel issue, this court grant him a writ of habeas corpus.

Dated: Oakland, California, Monday, January 25, 2010.


/s/ Paul McCarthy
_____

**Robert J. Beles**
**Paul McCarthy**
Attorneys for Petitioner


### VERIFICATION

Petitioner is in custody outside of this county. I therefore verify this petition on his behalf. The facts in this petition are true and correct based on my review of the transcripts and record in this case. Executed in Oakland, California, on Monday, January 25, 2010.


/s/ Paul McCarthy
_____

**Paul McCarthy**
Attorney for Petitioner

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

1

### United States District Court
### Eastern District of California

2

3   | STEVEN ALLEN JONES, | No. |

4   | *Petitioner*, | MEMORANDUM OF POINTS AND AUTHORITIES |
        vs.

5

6   MIKE MCDONALD, Warden, High Desert
    State Prison, Susanville, California,

7                      *Respondent*.

8   PEOPLE OF THE STATE OF CALIFORNIA,

9                      *Real Party in Interest*.

10   ## MEMORANDUM OF POINTS AND AUTHORITIES

11   ### 1. Introduction

12

13   The facts in this case are disturbing. They suggest that petitioner was the wrong man, tried and convicted for crimes he did not commit.

14

15   Apart from the admitted accomplice, Flanagan, the prosecution's chief eyewitness to the crimes was Gonzalez. Gonzalez negotiated the marijuana sale in Eureka and at the rest area. He spoke with all four men in the green car. He saw the gunman fire from close range, a distance of three to five feet. Gonzalez identified Gordon, Flanagan, and David Jones, but as the fourth man / gunman, Gonzalez identified Dwayne Williams from a photo taken from a disposable camera found in the green car.

16

17

18

19

20   This is not a case of an eyewitness who merely fails to identify one of the culprits. Gonzalez identified some one else as the gunman – an individual who was a close associate of Flanagan's, that Flanagan had known since junior high school, and the person Flanagan telephoned during his first few hours in custody.

21

22

23

24   Gonzalez was a personal friend of the deceased Jarvis. Gonzalez had first met David Jones in Eureka the night before, November 1, 2003, and the other three either in Eureka or at the rest stop on November 2, 2003. Gonzalez would have had no motive to give one of the accused a break and identify a fifth, uncharged party as the gunman.

25

26

27

28

Flanagan told Detective Nawrock, at the outset, that his companions, besides Gordon, were David Jones and petitioner (referred to by nicknames) and that petitioner was the gunman. The prosecutor must not have believed Flanagan's story that petitioner was the gunman, because the prosecutor chose to prosecute Gordon as the gunman based on Gordon's alleged confession to Waxman. It was only after Gordon's jury failed to convict Gordon as the gunman that that the prosecutor decided to call Flanagan as a witness and present a theory that petitioner was the gunman. The prosecutor did so knowing that the chief independent eyewitness, Gonzalez, had already identified an uncharged associate of Flanagan's as the gunman.

The prosecutor prevented petitioner's counsel from calling Waxman, a legitimate witness whom the prosecutor himself had called at Gordon's trial, by convincing the judge to allow him to introduce Gordon's trial testimony if Waxman testified. Waxman would presumably have said that Gordon had confessed to being the gunman. The prosecutor must have believed that Gordon's denial and attempt to blame petitioner were false, at least at the time of Gordon's trial. Petitioner's counsel did manage to call Raines to testify that Flanagan had admitted that petitioner was a "fall guy", but two law enforcement officials and a prosecutor visited Raines the weekend before he was called to testify and tried to prevent him from testifying by warning him that he could be prosecuted for perjury if he lied on the witness stand. The prosecution's tactics in suppressing and attempting to suppress favorable defense evidence suggests that the prosecutor believed that such evidence might lead the jury to acquit petitioner if it was presented.

Petitioner even appeared at his regular court-ordered domestic violence - anger management class the very next evening in Richmond after he had allegedly been stranded in distant Trinity County without transportation.

All of this suggests that the prosecution knew that there was a risk that Flanagan was shielding his friend, Williams, from criminal liability by falsely accusing petitioner, but accepted this risk in exchange for Flanagan's cooperation. Assuming Williams was the fourth man, Flanagan's substitution of petitioner was a logical choice, since Flanagan knew that petitioner was an associate of David Jones in the music business.

Although the federal court does not redetermine the guilt or innocence of a habeas corpus

petitioner, it can consider the underlying facts of the case as evidence that petitioner did not receive a fair trial.

**2. Where the only evidence implicating petitioner in the crimes was the uncorroborated testimony of an accomplice, petitioner's conviction was fundamentally unfair and violated his right to a fair trial in violation of his right to due process of law under the Fourteenth Amendment to the United States Constitution.**

### a. Introduction

Under California law, a defendant cannot be convicted on the uncorroborated testimony of an accomplice to the crime. California California Penal Code section 1111, *People v. Fauber* (1992) 2 Cal. 4th 792, citing *People v. Tewksbury* (1976) 15 Cal.3d 953, 958. The corroboration rule is not required by the Constitution or federal law. *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993.) However, the federal court can grant habeas relief for a conviction based on the uncorroborated testimony of an accomplice if this violates the petitioner's due process right to fundamental fairness. *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000), citing *Estelle v. McGuire*, 502 U.S. 62, 72-73, 116 L. Ed. 2d 385, 112 S. Ct. 475 (1991). "A State violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement." *Laboa v. Calderon, id,* citing *Hicks v. Oklahoma*, 447 U.S. 343, 346, 65 L. Ed. 2d 175, 100 S. Ct. 2227 (1980).

In *Laboa v. Calderon*, the Ninth Circuit found no such arbitrary deprivation because the accomplice's testimony had been adequately corroborated by the defendant's own statements that had been recorded in a surreptitiously-taped conversation in a police van. In this case, there were no statements of petitioner introduced into evidence, and no other evidence corroborating the accomplice Flanagan's testimony. Indeed, as mentioned before, Gonzalez' eyewitness testimony contradicted Flanagan's testimony. The Court of Appeal, however, found corroboration, in essence, by allowing Flanagan's testimony to corroborate itself, arbitrarily depriving petitioner of the protection of section 1111.

Under section 1111, the corroborative evidence required by section 1111 must come in by means of the testimony of a non accomplice witness. *People v. Fauber, People v. Tewksbury* (1976) 15 Cal.3d 953, 958. Such corroborating evidence must tend to connect the defendant

with the crime without aid or assistance from the testimony of the accomplice, since, otherwise, the corroboration is essentially being bootstrapped. *People v. Luker* (1965) 63 Cal.2d 464, 469. Finally, it is insufficient corroboration merely to connect a defendant with the accomplice or other persons participating in the crime. *People v. Robinson* (1964) 61 Cal.2d 373, 400, citing *People v. Reingold*, 87 Cal.App.2d 382, 399-400.

In 1903, the California Supreme Court set forth the test for determining whether the evidence claimed to corroborate the testimony of the accomplice actually corroborates it to the extent required by law:

> "[E]liminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be any inculpatory evidence -- evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no inculpatory evidence, there is no corroboration, although the accomplice may be corroborated in regard to any number of facts sworn to by him."

*People v. Morton* (1903) 139 Cal. 719, 724, *accord*, *People v. Shaw* (1941) 17 Cal. 2d 778, 803, *People v. Reingold,* 87 Cal.App.2d at 392-393, *People v. Falconer* (1988) 201 Cal. App. 3d 1540, 1543, citing *Shaw, Reingold*, and *People v. Szeto* (1981) 29 Cal.3d 20, 27. See also *People v. Abilez* (2007) 41 Cal.4th 472, 505, citing *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128.

### b. Evidence claimed to be corroboration

The "corroboration" cited by the Court of Appeal consisted of the following:

### i. Lyntasha Barrett's "identification."

"Lyntasha Barrett testified that she identified Steven and David from a photographic lineup and told the detective she was "positive" she saw these two men at Club West in Eureka the night of the after-party following the rap concert on November 1, 2003."

### ii. "Steven's" text messager device

"Flanagan's cell phone and Steven's text messager device, which were found in the abandoned Taurus, revealed that 10 or 11 phone calls or messages had been exchanged between the two men between October 30 and November 1, 2003, as Flanagan testified."

### iii. DNA evidence

c. "Several other items found in the back seat of the Taurus, including a baseball cap, a head wrap, and a blood stain on the seat, bore Steven's DNA, and expert testimony established that neither Jarvis or any of the other three occupants in the Taurus were the source of the DNA on those items."

### iv. Details of robbery / shooting

d. "Gonzales testified that when the Taurus pulled into the rest stop, there were four men in the vehicle, that David alighted from the back seat on the passenger side to speak with him, and at that time, he (Gonzales) recognized David as the man he had spoken to the night before at Club West. The testimony of Gonzales and Owen further established that after stealing the marijuana, David climbed into the back passenger side of the Taurus, where he struggled with Jarvis who was attempting to recover the marijuana. Residents who witnessed the end of the chase and the shooting testified that the passenger in the back seat behind the driver was firing at the truck during the chase and that when the Taurus stopped, a young black man got out of the back seat on the driver's side of the Taurus and fired five gunshots at the truck and then returned to the car. Afterwards, when the Taurus was heading towards Thurman on the bridge, Thurman saw the passenger who was seated behind the driver waving a gun at him."

**v. Information that petitioner was in New York and Nevada**

e. "After the crime, law enforcement officers were unable to find Steven for more than six months despite extensive efforts and at the end of that period, they received information he was in New York and then in Nevada using the name Michael Dennis Griffith."

**vi. Summary**

f. "In sum, there was independent evidence that placed Steven in Eureka the night before the murder and established that during the events leading up to and immediately following the shooting, it was Steven who was sitting in the back seat behind the driver, and therefore it was Steven who was firing the gun during the chase and who shot the two victims. Additionally, evidence indicating that after the crime, Steven fled California using a false name to conceal his whereabouts and his identity and presented a false alibi defense at trial, raised strong inferences of a consciousness of guilt."

**c. Response - no record evidence corroborated Flanagan's testimony that petitioner was at the scene of the crime or was the gunman.**

**Lyntasha Barrett's "identification":** If Ms. Barrett had actually testified that she had seen petitioner and David Jones at the after dinner party at Club West in Eureka on the night of the after party following the E-40 concert on November 1, 2003, she would actually have contradicted, rather than corroborated, Flanagan's testimony. Flanagan testified that he and his three companions had arrived in Eureka too late to get into the after-party at Club West and only mingled with others outside the club. (RT. v. 4 p. 1182.) However, as discussed in the petition, Barrett was emphatic that she had not identified any of the pictures shown to her as individuals she had seen in Eureka the night before. She said that all she'd told Detective Nawrock that she'd seen someone with eyes similar to one of the men in the photos, and seen someone with braids similar to another of the men in the photos. (RT. vol. 6, p. 1613 and 1614.) Although the two photos Barrett picked out as having similar features were petitioner and David

Jones, Barrett was unable to identify either petitioner or David Jones in court. (RT. vol. 6 pp. 1619 and 1620.)

But even if that Barrett had testified that she had seen petitioner in Eureka on November 1, 2003, this would not have corroborated Flanagan's testimony that petitioner was at the scene of the crime on November 2, 2003. The robbery and shooting took place near Hawkins Bar, California, approximately 56 miles from Eureka. Evidence that petitioner was in Eureka the night before would no more corroborate his presence in Hawkins Bar than placing a suspect in Sacramento the night before a crime occurred in Vallejo would "corroborate" his alleged participation in that crime. Moreover, there had been a rap concert in Eureka, presumably drawing people there from various places in Northern California. Barrett herself was from Richmond. The argument that attending a rap concert would "corroborate" a suspect's participation in any crime occurring within a 60 mile radius the next day sounds almost racist.

**Petitioner's test messager device:** The only evidence that the text messager device found in the green car was petitioner's was Flanagan's own testimony. This would be bootstrap "corroboration" under *People v. Luker*.

**DNA evidence:** Various items of clothing and a blood stain on the seat of the green car contained petitioner's DNA. The DNA analyst Inacio could not estimate the age of the samples. The DNA evidence was slightly weaker than finding petitioner's fingerprint in the car, since someone else might have brought the clothing into the car. However, the closest comparison is with the fingerprint cases like *People v. Robinson*, in which the defendant's fingerprints had been found on the outside of the car used in the commission of the crime. The fingerprint expert testified that, although he could not place the date on which the prints were put on the car, he believed they were relatively recent because of the fact that the car was out of doors and prints on a painted surface disappear sooner when exposed to the elements. The court held:

> "Association with a criminal is not to be equated with connection with the crime. Moreover such a contention asks the jury to speculate on how and why the fingerprints appeared, with no evidence at all on that question. Even if the fact of the fingerprints be deemed to cast suspicion, even grave suspicion, on Drivers, such is insufficient. 'It is necessary that the evidence corroborating an accomplice shall connect or tend to connect the defendant with the commission of the crime. Corroborative evidence is insufficient where it merely casts a grave suspicion upon

the accused. It must not only show the commission of the offense and the circumstances thereof, but must also implicate the accused in it. . . .' (*People v. Robbins*, 171 Cal. 466, 470. At best, the fingerprints merely placed Drivers in the car at some time prior to the time the car was discovered. According to the inferences to be derived from the testimony of the prosecution's witnesses that could have been around the dinner hour, and before Drivers claimed to have parted company with the man who confessed to the commission of the crime some five or six hours later. This merely proves association. In *People v. Reingold*, 87 Cal.App.2d 382, 399-400, it was said:. 'There can be no question that it is insufficient corroboration merely to connect a defendant with the accomplice or other persons participating in the crime, but evidence independent of the testimony of the accomplice must tend to connect a defendant with the crime itself, and not simply with its perpetrators. It is not with the thief that the connection must be had but with the commission of the crime itself.'"

*People v. Robinson*, 61 Cal. 2d at 399-400.

 *Birt v. Superior Court* (1973) 34 Cal.App.3d 934 extended the same rationale to a defendant's fingerprints found inside a van, on a cigarette lighter, where the van had been used by burglars to carry away the loot. This was the only evidence of defendant's involvement in the crime presented at his preliminary examination. The Court of Appeals held that the evidence was insufficient to support a holding order:

> "At most, the presence of petitioner's fingerprint on the lighter found on the front seat showed that, at some unknown time and place, she had been inside the van; but there was no direct or circumstantial evidence to indicate when and where that had been. Only by guesswork, speculation, or conjecture can it be inferred that petitioner was inside the van, or in the area, at the time of the McNutt burglary."

*Birt v. Superior Court*, 34 Cal. App. 3d at 938, citing cases.

 These cases are similar to the Ninth Circuit's opinion in *Mikes v. Borg*, 947 F.2d 353 (9th Cir. 1991), which held that in fingerprint-only cases in which the prosecution's theory is based on the premise that the defendant handled certain objects while committing the crime in question, the record must contain sufficient evidence from which the trier of fact could reasonably infer that the fingerprints were in fact impressed at that time and not at some earlier time. *Mikes v. Borg*, 947 F.2d at 356-357. Defendant's fingerprints had been found on a three foot chromed post that had been used to bludgeon the victim to death in the basement of his fix-it shop, and on a similar six foot chromed post. The posts had been part of a turnstile unit that the victim had purchased at a hardware store's going out-of-business sale, approximately four months prior to his death. The Ninth Circuit held that since the defendant could have impressed his fingerprints on them

before the victim acquired them, *Mikes v. Borg,* 947 F.2d at 359, the evidence fell "far short" of supporting a reasonable factfinder's conclusion that the posts were not accessible to the defendant before the victim acquired them, and defendant's constitutional right not to be convicted except by proof beyond a reasonable doubt was violated. Id. at 361.

The Court of Appeal, however, held that there was evidence in *Robinson* that "defendant and the car's owner were frequent visitors to the accomplice's apartment, and it was just as likely he had been in the car on other occasions as it was at the time of the crime. (Id. at p. 398.)" Petitioner, held the Court of Appeal, did not produce independent evidence that he had been in Flanagan's car before November 2, 2003. However, neither California law nor analogous federal law require defendant to introduce any evidence of innocent prior contact unless the area in which his fingerprints were found was inaccessible to the general public, and the cases finding the fingerprint area "inaccessible" typically involve immovable surfaces on the inside of private buildings. See, e.g., *Taylor v. Stainer,* 31 F.3d 907, 908-910 (9th Cir. 1994) (defendant's fingerprint found on inside window sill), *Schell v. Witek,* 218 F.3d 101 (9th Cir. 2000) (defendant's fingerprint found on inside surface of glass louver that had been removed by burglar to gain access to the house), *People v. Bean* (1988) 46 Cal.3d 919 (defendant's palmprint found on kitchen counter inside house.) Where the fingerprints are left on movable objects found at the scene, the courts are much less likely to find such evidence sufficient to connect defendant, even if the movable object is found in an inaccessible place, see, e.g., *Mikes v. Borg.*

Cases involving vehicles are even more problematic, as vehicles by their nature are more accessible to the general public than the interiors of private buildings. They change hands, admit casual guests and riders, and are on occasion left unlocked with their interiors fully accessible to the general public, even those unauthorized to be there. In *Birt v. Superior Court*, the only evidence that the defendant might have had prior access to the interior of the van was the fact that the van was a rental vehicle – there was no evidence that the defendant had ever been in the van. This was enough to show the possibility that the fingerprint was left on the lighter at some time other than the burglary. In this case, the green car involved in the robbery was not even Flanagan's. He had borrowed the car from his father. This was a car shared among more than one

person. The items of clothing found in the car did not even show that petitioner had been in the car, but only that clothing with his DNA on it had been in the car. The bloodstain on the seat more strongly suggests that petitioner had been in the car, but unlike fingerprints, which an individual must personally impress on a surface, DNA can be transferred from one object to another. Even if this evidence was considered as proof that petitioner had been in the car at some time, the record did not show that the only time petitioner could have been in the car was at the time of the crime.[5]

**Details of robbery / shooting**: Of course, "corroboration" of Flanagan's testimony about details of the robbery not directly implicating petitioner would not be sufficient to provide corroboration of petitioner's involvement. "Corroboration" must connect the defendant to the crime, not merely support the accomplice's testimony on other matters. Corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. *People v. Rodrigues*, 8 Cal. 4th at 1128, citing California Penal Code section 1111.

**Information that petitioner was in New York and Nevada:** The trial court disposed of petitioner's various hearsay and authentication objections by instructing the jury that it could not consider such evidence for the truth of the matter concerned, but only to explain Detective Nawrock's subsequent actions. Thus, the jury could not have used the information as evidence that petitioner fled the jurisdiction. Evidence Code section 355. Such limited purpose evidence could not have corroborated Flanagan's testimony that petitioner was involved in the crime.

However, even if the limited purpose evidence could properly have been considered as evidence that petitioner fled the jurisdiction[6], it would not connect him with the specific crime that he was being prosecuted for, but only with "some offense." While circumstances such as flight may be received in evidence as indicating a consciousness of guilt, and may be considered

---

[5] Respondent relied on Flanagan's testimony that petitioner had never been in the car except during the trip to Eureka and subsequent robbery / shooting. The Court of Appeal did not rely on this, probably because it was too obviously "bootstrap" corroboration.

[6] Evidence that petitioner fled the immediate crime scene could only have been based on Flanagan's testimony that petitioner was at the crime scene, and would thus be another example of "bootstrap" corroboration.

as corroboration of an accomplice:

> "...unless the circumstances relied upon for 'corroboration' furnish inculpatory evidence -- that is, evidence tending to connect appellant with the specific crime involved... it is not legal and sufficient corroboration."

*People v. Reingold,* 87 Cal.App.2d at 399-400. Accord, *People v. Rodrigues*, 8 Cal. 4th at 1128.

Cases where courts have found that evidence of flight corroborated an accomplice's testimony involve a direct link between the crime and the flight. Either the flight took place shortly after the crime, or other evidence (often, admissions by the defendant) showed that he or she fled to avoid prosecution for the crime. See, e.g., *People v. Jones*, (1991) 53 Cal. 3d 1115, 1145 (defendant attempted to leave town within hours after the commission of the crime), *People v. Mendoza* (2000) 24 Cal 4th 130, *People v. Hall* (1934) 220 Cal 166. While *People v. Mason* (1991) 52 Cal.3d 909 held that "immediacy" depends on the facts of the case and that in that case, flight occurring four weeks after the commission of the crime was "immediate", the "flight" in *Mason* was unequivocal - a high speed chase by sheriff's deputies. *People v. Santo,* 43 Cal.2d 319, on which *Mason* relied, involved similarly unequivocal evidence – defendant admitted that she had moved after reading in the newspaper that her accomplice had been arrested and had implicated her in the murder.

Here, there was no evidence that petitioner left California before the beginning of May, 2004, when Detective Nawrock received information that petitioner was in New York. The crime had been committed November 3, 2003, and Flanagan had accused the individual he knew as "Kamikazi" of the "Fatal Connections" band of the crime days after he was arrested. Detective Nawrock testified that the sheriffs had determined that "Kamikazi" was petitioner and had looked for him in Richmond in December, 2003, but were unable to find him. Nawrock also admitted, however, that they had spoken to petitioner's father for the first time on March 4, 2004. Since the evidence, even if considered for its truth, only showed that petitioner left California at some time before May of 2004, it would have been speculation to conclude that he might have left after learning that he had been accused of the crime from his father.

The evidence that the Court of Appeal relied on as supposedly corroborating Flanagan's testimony fell so far outside what is considered legitimate corroboration under California law that

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

petitioner was effectively convicted based on the uncorroborated word of an accomplice, and was therefore arbitrarily denied his rights under section 1111 in violation of his right to due process of law.

### 3. Trying petitioner as the gunman where the prosecution had previously tried Gordon as the gunman, and the evidence was undisputed that there was only one gunman, violated petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution.

The California Supreme Court stated the law regarding inconsistent prosecution theories in *In re Sakarias* (2005) 35 Cal. 4th 140, holding that:

> "...fundamental fairness does not permit the People, without a good faith justification, to attribute to two defendants, in separate trials, a criminal act only one defendant could have committed. By doing so, the state necessarily urges conviction or an increase in culpability in one of the cases on a false factual basis, a result inconsistent with the goal of the criminal trial as a search for truth."

*In re Sakarias,* 35 Cal. 4th at 155-156. The California Supreme Court relied on the Ninth Circuit's decision in *Thompson v. Calderon,* 120 F.3d 1045 at 1058 (9th Cir. 1997) that "when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime" consistent with due process. *In re Sakarias*, 35 Cal. 4th at 157. Although *Sakarias* specifically held that the prosecution cannot use inconsistent theories to obtain convictions in both trials, the court also condemned the "seeking of convictions" irrespective of whether a convictions was obtained in the other trial. See *In re Sakarias*, 35 Cal. 4th at 158, quoting *Smith v. Groose* 205 F.3d 1045 at 1051-1052 (8th Cir. 2000), ("'the use of inherently ... contradictory theories violates the principles of due process' for '[t]he State's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth' (id. at p. 1051)"), also noting that "the prosecution's use of inconsistent and irreconcilable theories has also been criticized as inconsistent with the principles of public prosecution and the integrity of the criminal trial system." *In re Sakarias*, 35 Cal. 4th at 159, and see discussion, *In re Sakarias*, 35 Cal. 4th at 163, where the court held that the "seeking of convictions" and "pursuing" of "inconsistent theories", under some circumstances, violates the due process rights of the defendant actually convicted.

*Sakarias* also held that the prosecution could use inconsistent theories if it did so "in good faith". One example of "good faith" would be "a significant change in the available evidence", but the court made it clear that the "change" could not be caused by a "strategic decision" of the prosecution. *In re Sakarias*, 35 Cal. 4th at 162.

The only "change in the available evidence" was the jury's acquittal of Gordon. The prosecution had Flanagan's statements to Nawrock at the time of Gordon's trial and knew that Flanagan, if called, would implicate petitioner rather than Gordon. No new evidence of petitioner's alleged involvement as the gunman came to light between the two trials.

*Sakarias* also held that "where the probable truth of the situation can be determined – where we are able to say which of the prosecution theories was likely true and which false – only the defendant prejudiced by the false attribution is entitled to relief." *In re Sakarias* (2005) 35 Cal. 4th at 164. But in *Sakarias*, the evidence had later been reviewed by a referee, who determined that the great weight of evidence was that the other defendant, rather than Sakarias, delivered the death blow. *Sakarias* also held that "If ... the court cannot determine which of the two versions is true, the prosecution should lose the benefit of both positions." *In re Sakarias*, 35 Cal. 4th at 165, n8., citing Poulin, **Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get Its Story Straight** (2001) 89 Cal. L.Rev. 1423, 1477. The evidence that petitioner was the gunman, or was even a participant, consisted solely of the testimony of the accomplice, Flanagan, which had to be corroborated to be accepted. Gordon, however, admitted to Waxler that he was the gunman. Waxler was not an accomplice. While a confession must also be corroborated under state law, the eyewitnesses identified Gordon as a participant in the crime, but did not identify petitioner as even being there. If this is not sufficient for this court to determine that Gordon was probably the gunman instead of petitioner, it should find at least that the court cannot determine which version was correct and that petitioner was prejudiced by the prosecutor's use of inconsistent defenses.

### 4. Admission of "other crimes" evidence violated petitioner's right to due process of law.

Over petitioner's objections, the court admitted evidence that petitioner's DNA profiles

had been found in the California and national DNA felony indexes. The DNA profiles were admitted under the excuse that the case was a "cold hit" case in which an unknown DNA sample was matched to samples in the indexes. Of course, this was not a "cold hit" case by any stretch of the imagination. Flanagan had told law enforcement that petitioner, whom he knew by a nickname, was a participant in the crime. Police investigation had confirmed that the individual identified by Flanagan was petitioner. All that the prosecution's expert had to do was to match petitioner's DNA to the samples taken from the car seat and items found in the car. That petitioner's DNA sample that Trinity County law enforcement took from him matched other samples previously taken from petitioner and placed in the California and national felony indexes proved only that petitioner had prior felony arrests and convictions. It did not prove anything about DNA testing generally, as one would expect two samples taken from the same person to match.

Introduction of evidence of prior crimes that simply shows defendant's propensity to commit a crime violates a defendant's right to due process if it is not cumulative or insignificant, is a type likely to have a strong impact on the jurors, and there are no permissible inferences the jury may draw from the evidence. *McKinney v. Rees,* 993 F.2d 1378 at 1384 (9th Cir. 1993), *citing Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.1991); *Garceau v. Woodford,* 275 F.3d 769 (9th Cir. 2001.)

**5. Instructing the jury that it could find that petitioner fled
and infer consciousness of guilt from that finding, where
there was no evidence of flight except for the accomplice
Flanagan's testimony, violated petitioner's due process rights.**

Giving the jury the flight instruction implied that the court believed that there was evidence to support it. As previously shown, there was no evidence of flight except for Flanagan's testimony that petitioner had left the scene of the crime. The trial court had previously allowed the admission of evidence that petitioner had been outside of the State of California subject to a limiting instruction under California Evidence Code section 355 that the jury could not consider such evidence for its truth, but only to explain Detective Nawrock's later actions. As the jury could not consider that evidence, the only other evidence it could have considered was Flanagan's

testimony. Reasonable jurors could have interpreted the flight instruction as permitting it to consider Flanagan's testimony on the issue of flight, even if it was uncorroborated. Essentially, the court instructed the jury that it could find flight based on Flanagan's uncorroborated testimony. Since a finding of flight would then have corroborated Flanagan's testimony, the flight instruction, in effect, permitted the jury to engage in bootstrap reasoning when considering the court's instruction that

The erroneous giving of the flight instruction arbitrarily deprived petitioner of a right not to have the jury consider an issue unsupported by the evidence and thus denied him due process of law under *Hicks v. Oklahoma., supra.*

**6. Defense counsel was ineffective in failing to object on confrontation grounds to the trial court's ruling that Gordon's previous testimony accusing appellant of the crime could be introduced if Michael Waxler testified, and in failing to call Waxler.**

Waxler, a jailhouse informant, had testified at Gordon's trial that Gordon had admitted to him that Gordon personally shot Jarvis. Waxler's testimony not only contradicted Flanagan's identification of appellant as the gunman, but by doing so, undermined Flanagan's testimony. Appellant's counsel proposed to call Waxler as a witness, who was apparently available, or to introduce his prior court testimony. The trial court granted the prosecutor's request that he be allowed to introduce Gordon's trial testimony that appellant had been the gunman. Faced with this ruling, appellant's counsel decided not to call Waxler.

The trial court's ruling was unlawful. In *Crawford v. Washington* (2004) 541 U.S. 36; 124 S. Ct. 1354; 158 L. Ed. 2d 177, the United States Supreme Court held that testimonial hearsay cannot be introduced consistently with the Confrontation Clause of the Sixth Amendment, as applied to the States through the Fourteenth Amendment, unless the defense has had an opportunity to cross-examine the declarant. Gordon's prior trial testimony was, of course, testimonial hearsay under any reading of *Crawford*, and under that case, it could not be introduced under any contrary State hearsay exception since there had been no prior opportunity to cross-examine Gordon. The only entity who had an opportunity to cross-examine Gordon was the government, and such cross-examination was not an adequate substitute for defense cross-

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

examination. Only Gordon's live testimony would have satisfied *Crawford*, even if the lack of such testimony meant that Waxler could testify uncontradicted.

As appellant's counsel had no tactical reason for not raising *Crawford*, the only conclusion that can be drawn is that counsel was unaware of the *Crawford* decision. *Crawford* was decided on March 8, 2004, long before appellant's trial, and was a major decision that has been widely discussed.[7]

### 7.  Error, considered cumulatively, violated petitioner's due process rights.

The court considers the prejudicial effect of all errors cumulatively, not in isolation. *Thomas v. Hubbard,* 273 F.3d 1164, 1180 (9th Cir. 2002) (holding that cumulative effect of errors denied defendant of due process of law under the Fourteenth Amendment to the United States Constitution.)

### 8. Conclusion

For these reasons, this court must grant a writ of habeas corpus.

Dated: Oakland, California, Monday, January 25, 2010.


/s/ Paul McCarthy
_____

**Robert J. Beles**
**Paul McCarthy**
Attorneys for *Appellant* STEVEN JONES

---

[7] Counsel also inexplicably elicited detective Nawrock's testimony that Gordon had identified appellant as one of the participants in the crime, another item of unquestionably testimonial hearsay that Nawrock could not have testified to on his own. Counsel could not have had any tactical reason for doing this. While, the testimony of another accomplice cannot corroborate an accomplice's testimony, *People v. Belton* (1979) 23 Cal. 3d 516, 534, *People v. Scofield* (1971) 17 Cal.App.3d 1018, *People v. Creegan* (1898) 121 Cal. 554, 555, the jury was not so instructed, and they could well have considered this as corroborating Flanagan's testimony that petitioner was a participant in the crime.