1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE EASTERN DISTRICT OF CALIFORNIA

11  STEVEN ALLEN JONES,

12              Petitioner,              2: 10 - cv - 196 - MCE TJB

13        vs.

14  MIKE McDONALD,

15              Respondent.             <u>ORDER, FINDINGS AND</u>

16                                       <u>RECOMMENDATIONS</u>

17  _____/

18        Petitioner, Steven Allen Jones, is a state prisoner proceeding with a counseled petition for

19  writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of

20  life in prison without the possibility of parole plus 75 years to life in prison after a jury convicted

21  him of first degree murder, attempted murder, robbery, and several related enhancements.

22  Petitioner raises five claims in this federal habeas petition; specifically: (1) his convictions

23  violate due process as they are based on the uncorroborated testimony of an accomplice ("Claim

24  I"); (2) trying Petitioner as the gunman where the state had previously alleged in a separate trial

25  that a different accomplice was the gunman violated due process ("Claim II"); (3) the trial court's

26  admission of evidence of past crimes violated due process ("Claim III"); (4) the trial court

1

1    violated due process when it instructed the jury that it could find that petitioner fled from the

2    crime and could infer consciousness of guilt from that finding, where the only evidence of flight

3    was the uncorroborated testimony of an accomplice ("Claim IV"); and, (5) his trial counsel was

4    ineffective for failing to object on Confrontation Clause grounds to the introduction of the

5    statements of an accomplice who was tried at a separate trial ("Claim V").  For the reasons stated

6    herein, the federal habeas petition should be denied.

7                              I. FACTUAL BACKGROUND[1]

8    Defendants Steven Allen Jones, Jr. [Petitioner] and David Darrao
     Jones FN1 appeal from the judgment of conviction after a jury
9    found them guilty in count one of the first degree murder of John
     Jarvis ( Pen.Code, § 187, subd. (a)), FN2 in count two of the
10   attempted murder of Ian Michael Gonzales (664/187, subd. (a))
     and in count three of robbery of both men. (§ 211.) The jury found
11   true as to both defendants the special circumstance that the murder
     was committed in the commission of a robbery (§ 190.2, subd.
12   (a)(17)) and the sentence enhancement that a principal was armed
     with a firearm. (§ 12022, subd. (a)(1); Counts 1, 2, and 3.) As to
13   Steven, the jury further found the murder and the attempted murder
     were willful, deliberate and premeditated (§§ 189/664, subd. (a)),
14   that he personally and intentionally discharged a firearm
     proximately causing great bodily injury or death to Jarvis and
15   Gonzales (§ 12022 .53, subd. (d); Counts 1, 2 and 3) and
     personally inflicted great bodily injury on Jarvis and Gonzales. (§
16   12022.7, subd. (a); Counts 2, 3.)

17                FN1. Although defendants have the same family
                  name, they are not related. In the interests of clarity
18                we shall refer to them by their given names. We
                  mean no disrespect.
19
                  FN2. All further section references are to the Penal
20                Code unless otherwise specified.

21   Steven was sentenced to prison for life without the possibility of
     parole, plus 75 years to life.FN3 David was sentenced to prison for
22   life without the possibility of parole plus 11 years.FN4 . . . .

23         ///

24   ────────────────────────

25   [1]      The factual background is taken from the California Court of Appeal, Third
     Appellate District decision on direct appeal from July 2008 and filed in this Court by Respondent
26   on June 4, 2010 as Lodged Doc. No. 5 (hereinafter referred to as the "Slip Op.").

FN3. Steven was sentenced to prison for life without the possibility of parole for first degree murder (§§ 187, 190.2, subd. (a)(17)), plus a consecutive life term for the attempted murder (§§ 664/187), and three consecutive terms of 25 years to life, one for the robbery (§ 211), one for the section 12022.53, subdivision (d) enhancement associated with count one and one for the section 12022.53, subdivision (d) enhancement associated with count two. The sentences on the remaining enhancements were stayed.

FN4. David was sentenced to prison for life without the possibility of parole for first degree murder (§ 187/190.2, subd. (a)(17)), plus consecutive terms of seven years for attempted murder (§ 187/664, subd. (a)), three years for robbery (§§ 211, subd. (c), 213, subd. (a)(2)), and one year for the arming enhancement on count three. (§ 12022, subd. (a)(1).)

## FACTUAL BACKGROUND

In a nutshell, the murder and attempted murder resulted from a drug deal gone bad. The evidence shows that defendant David agreed to buy four pounds of marijuana from John Jarvis and Ian Michael Gonzales for $12,000. Instead, he stole the marijuana from the back of Jarvis's truck and then jumped into a waiting getaway car occupied by defendant Steven and two other cohorts. Jarvis and Gonzales pursued the getaway car in Jarvis's truck, repeatedly ramming the car, which eventually spun around and knocked the truck into a ditch. After the truck was immobilized, Steven exited the car and shot the two men, killing Jarvis and wounding Gonzales. As both defendants challenge the sufficiency of the evidence in several respects, we set forth the facts in some detail.

### The Prosecution's Evidence

### A. The Trip to Eureka

Leon Flanagan of Richmond met Steven in August or September 2003. Steven was in a rap group and introduced himself to Flanagan as "Steve O." In late September, the two men spoke about driving to Eureka where a well-known Bay Area rapper was performing and Flanagan was planning to perform at an after-party at Club West. They planned to drive to the concert and Flanagan arranged to use his father's green Ford Taurus. His friend, James Gordon, agreed to drive because Flanagan did not have a driver's license.

/ / /

3

In the late afternoon on Saturday, November 1, 2003, Flanagan and Gordon drove to Steven's residence and picked him up along with David, who was also a member of Steven's rap group. Gordon was driving, Flanagan was sitting in the front passenger seat, and Steven and David were seated in the back seats. By the time they arrived at Club West in Eureka, they were told it was too late to perform, so the foursome stayed awhile and then checked into a motel for the night.

B. The Marijuana Deal

Gonzales lived in Trinity County and grew and sold marijuana. On November 1, he went with some friends to the rap concert in Eureka. The concert ended around midnight and Gonzales and his friends decided to go to the after-party at Club West. While they were standing in line smoking marijuana, they met a group of three or four African-American men from the Bay Area who were interested in buying about five pounds of marijuana for approximately $15,000. One of them was David, to whom Gonzales spoke to for about an hour outside the club. Before leaving, Gonzales told the men to contact him at his home around noon the following day.

The next morning on November 2, 2003, Gonzales had several telephone conversations with Jarvis who needed money and wanted to sell some marijuana. It was agreed that Jarvis would sell David four pounds of marijuana and that he would receive $11,000 and Gonzales would receive $1,000 or $1,200. The Bay Area men telephoned Gonzales around 10:30 or 11:00 a.m. and told him they had the money, so he arranged to meet them at a rest stop on Highway 299 near Salyer.

Jarvis and his girlfriend, Devon Owen, picked Gonzales up in Jarvis's pick-up truck and headed to the rest area to meet the buyers. The marijuana was in a large garbage bag in the back of Jarvis's truck. Because Jarvis and Gonzales did not know the buyers, it was decided that Gonzales's father, William Thurman, would drive separately to the rest area to monitor the sale. Thurman took a .30-30 deer rifle with him and he and Gonzales took radios to communicate. Thurman arrived at the rest stop, parked his Blazer, and busied himself by making minor repairs on the vehicle while he waited for Jarvis and Gonzales to arrive.

Meanwhile, after stopping at a gas station to buy gas, defendants and their two friends decided to take Highway 299 so they could drive Gordon to Vallejo where he lived. They drove for awhile and then stopped at a rest stop in Salyer where they all used the restroom and the telephone. Flanagan wanted to leave but Steven indicated that he was waiting for someone to arrive so he could buy some marijuana. After waiting a few minutes, they started to leave but then saw Gonzales arrive in Jarvis's truck. The two vehicles

4

pulled into adjacent parking spaces, although Gordon backed the Taurus into the space. Jarvis and Owen walked over to the restrooms while Gonzales spoke with David, showed him the marijuana, and smoked some of it with him. David told Gonzales he wanted to go to another location to conduct the transaction because they had been at the rest area too long and Gonzales suggested a secluded road a short distance away.

Gonzales walked over to Jarvis and Owen to tell them about the plan and while they were talking, Owen saw David get out of the Taurus and hesitate. Then she heard several voices coming from the Taurus yelling "Just do it. Go get it. Just do it. Just do. Get it." David walked around the back of the car, grabbed the bag of marijuana from the back of Jarvis's truck, ran back to the Taurus, and entered the passenger side of the car.

Meanwhile, Jarvis and Gonzales ran toward the Taurus, which had began to move. Jarvis grabbed a hold of David's shirt trying to retrieve the marijuana and grabbed onto the door frame as David jumped into the moving car. Hoping to stop the car, Gonzales stepped in the path of the Taurus but moved aside when it became apparent the car was not going to stop. As the Taurus sped up, Jarvis lost his footing and was dragged 10 to 12 feet until the door closed on his hand and he let go and rolled away. The Taurus left the rest area and Jarvis and Gonzales ran to the pickup truck to pursue them and Thurman followed them.

### C. The Vehicle Chase

The Taurus and the pick-up truck drove east on Highway 299 and when Jarvis caught up with the Taurus, he rammed the back of it several times hoping to stop the car and retrieve his marijuana. Gordon continued driving and at Steven's direction, turned onto Denny Road where Gonzales signaled them to pull over but Gordon proceeded across a bridge as Jarvis continued ramming the back of the car.

The vehicles drove down Denny Road until they came to a hairpin turn. Steven was holding a gun out the window and had been firing it at Jarvis's truck. The truck rammed the Taurus again, which caused the Taurus to spin around and knock the truck into a ditch. After pulling out of the ditch and hitting the Taurus again, the truck fell back into the ditch and was immobilized. The Taurus stalled and came to a stop about 10 or 12 feet past the truck. While Gordon attempted to restart the car, Steven got out, and retrieved something from the trunk.FN5 He then walked towards the disabled truck, where holding a gun double-handed, fired five shots into the truck, paused and fired another series of shots. He walked briskly back to the car and said "Get me out of here. Get me out of here. Please get me out of here" and Gordon drove back towards the bridge.

FN5. One eyewitness testified that he saw someone holding a pistol outside the rear driver's side window of the Taurus as the Taurus and the truck went by. Another eyewitness testified that she saw an African-American man holding a gun as he exited the back seat of the Taurus on the driver's side.

Gonzales was hit twice in the back but was able to check on Jarvis who was losing consciousness and died within minutes from wounds caused by a single bullet.

Meanwhile, Gonzales radioed his father and told him Jarvis had been killed. He warned Thurman that the Taurus was heading his way. Thurman stopped his Blazer on the other side of the bridge and blocked the road. As the Taurus headed toward him, Steven waived a pistol at Thurman who stood behind the door of his vehicle and fired a bullet through the radiator of the Taurus.

Gordon stopped the car and refused to drive any more, so Steven changed places with him, tossing a revolver into the river before getting into the driver's seat. Steven then turned the car around and sped back up Denny Road passing Jarvis's truck and the assembly of people who had gathered to assist Jarvis. About one or two miles up the road, one of the tires blew out and Steven pulled the Taurus into a small turn out on the side of the road.

When Flanagan walked away from the car to make a call from his cell phone, David and Steven pushed the Taurus off a steep embankment and then fled taking the bag of marijuana, which had been in the back seat in their possession. Gordon and Flanagan wandered around the area until 5:40 p.m. when they were picked up and arrested by Trinity County Sheriff's deputies about one mile from the crime scene.

### D. The Investigation

A criminalist processed the Taurus for evidence. He collected clothing, cigarette butts, and a sample of fabric from the back seat closer to the driver's side where he observed a red stain.

A few days after the crime, the Trinity County Sheriff's Department recovered the gun that Steven had thrown into the river. It was a .38 caliber Smith and Wesson revolver that held six shells and contained five expended cartridges and one empty cylinder. The ballistic evidence showed the bullet recovered from Jarvis's body was a .38 caliber bullet consistent with the revolver recovered from the river but results from a comparison of the bullet and the weapon were not conclusive.

/ / /

During a police interview on November 10, 2003, Gonzales identified Gordon and Flanagan from photographic lineups as two of the men in the Taurus.

By the beginning of December, the Sheriff's Department had Steven's and David's first names but were unable to locate them over the next few months. On January 8, 2004, a Richmond police officer spotted David seated in a vehicle. After detaining and searching him, he found 18 clear plastic baggies of marijuana in David's possession. The next day, when Detective Nawrock arrived to take David into custody and explained why he was there, David put his head down and cried.

On July 16, 2004, Flanagan spoke with Detective Nawrock and the prosecuting attorney. At that time, Flanagan identified Steven and David from photographic lineups and told them David had taken the marijuana and Steven was the shooter.

In 2004, Gordon was tried separately and convicted, and Flanagan was charged jointly with Steven and David. On May 3, 2005, Flanagan entered a negotiated plea in which he agreed to plead guilty to voluntary manslaughter and possession of a weapon and receive a sentence of 10 years imprisonment in exchange for his truthful testimony at Steven's and David's trial.

DNA profiles were developed from the items collected from the Taurus, including the red stain on fabric taken from the back seat, a baseball cap, and a head wrap, and were found to match Steven's DNA profile.FN6

> FN6. The DNA profile from the blood stain matched Steven's DNA profile along 12 loci and the probability that a random unrelated individual would by chance possess this profile at 12 loci was estimated to occur in approximately one in 5.5 quadrillion African-Americans, Steven's ethnic group. The DNA profile from the cap and head wrap matched Steven's DNA profile along 8 loci and the random chance of such a match was approximately one in 770 billion African-Americans.

The Trinity County Sheriff's deputies were unable to locate Steven until May 2004, when Detective Nawrock received information from the police in Auburn, New York that Steven had been in New York using the name Michael Dennis Griffith. Later in the month, Nawrock was advised that Michael Dennis Griffith had had contact with the Nevada Police Department, whereupon Nawrock travelled to Nevada and took Steven into custody.

/ / /

7

The Defense

Neither defendant testified but both called witnesses in support of alibi defenses.

Steven's evidence showed that he signed in for a court-ordered domestic violence and anger management counseling group in El Cerrito at 6:00 p.m. on November 3, 2003, the day after the shooting. He also presented evidence that no live performances had been planned for the Club West after-party.

Steven Raines, who was in jail with Steven and Flanagan in Trinity County, testified that Flanagan had told him Steven was being set up to take the fall for the crimes although he had not been present during the crimes.

David's evidence showed that on November 2, 2003, he picked up his son from his mother's home in Fairfield, took him to lunch, and brought him back around 2:00 p.m. Afterwards, he attended a barbeque in Richmond. He also presented the testimony of a forensic psychiatrist regarding factors that can affect memory and eyewitness identification.

## II. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States. *See* 28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

1    In applying AEDPA's standards, the federal court must "identify the state court decision

2    that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

3    "The relevant state court determination for purposes of AEDPA review is the last reasoned state

4    court decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

5    "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

6    orders upholding that judgment or rejecting same claim rest upon the same ground." *Ylst v.*

7    *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

8    must conduct an independent review of the record to determine whether the state court clearly

9    erred in its application of controlling federal law, and whether the state court's decision was

10    objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The

11    question under AEDPA is not whether a federal court believes the state court's determination

12    was incorrect but whether that determination was unreasonable—a substantially higher

13    threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

14    "When it is clear, however, that the state court has not decided an issue, we review that question

15    *de novo*." *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

16    545 U.S. 374, 377 (2005).

17                III.  ANALYSIS OF PETITIONER'S CLAIMS

18        1.  Claim I

19        In Claim I, Petitioner asserts that his conviction must be overturned because his

20    conviction rests on the testimony of his accomplice, Leon Flanagan, and such testimony was not

21    corroborated as required by California law.

22        Under California law, a "conviction cannot be had upon the testimony of an accomplice

23    unless it be corroborated by such other evidence as shall tend to connect the defendant with the

24    commission of the offense."  Cal. Penal Code § 1111.  "An accomplice is . . . one who is liable to

25    prosecution for the identical offense charged against the defendant on trial in the cause in which

26    the testimony of the accomplice is given." *Id.*; *People v. Verlinde*, 100 Cal. App. 4th 1146, 1158,

123 Cal. Rptr. 2d 322 (2002).

Penal Code section 1111 "is a state law requirement that a conviction be based on more than uncorroborated accomplice testimony . . . . As a state statutory rule, and to the extent that the uncorroborated testimony is not 'incredible or insubstantial on its face,' the rule is not required by the Constitution or federal law."[2]  *Laboa  v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (citation omitted).  Thus, to the extent that Petitioner is claiming that the trial court misapplied Penal Code section 1111, this claim is not cognizable on federal habeas review.  *Id.*; *see also Cummings v. Sirmons*, 506 F.3d 1211, 1237 (10th Cir. 2007) (no constitutional requirement that the testimony of an accomplice-witness be corroborated); *Harrington v. Nix*, 983 F.2d 872, 874 (8th Cir. 1993) ("[S]tate laws requiring corroboration do not implicate constitutional concerns that can be addressed on habeas review.  There is also no constitutional requirement that accomplice testimony be corroborated." (citations omitted)).

Nevertheless, "[a] State violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement."  *Laboa*, 224 F.3d at 979 (citing *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980)); *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991).  In *Laboa v. Calderon*, the Ninth Circuit determined that a violation of Penal Code section 1111 amounted to the arbitrary deprivation of a state law entitlement in violation of *Hicks v. Oklahoma*, but ultimately concluded the accomplice's testimony was sufficiently corroborated. *Laboa*, 224 F.3d at 979.  Since *Laboa*, courts within the Ninth Circuit have treated section 1111 as a state law entitlement creating a liberty interest.  *See, e.g.*, *Jenkins v. Hedgpeth*, 2010 WL 4449058 at *6 (C.D. Cal. 2010); *Chagolla v. Gonzalez*, 2011 WL 1344565 at *10 (C.D. Cal 2011); *Tran v. Horel*, 2008 WL 4414296 at *10 (N.D. Cal. 2008).

---

[2]     To the contrary, under federal law, "[t]he uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face." *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir.1993); *see also United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir.1999).  Petitioner does not claim that Flanagan's testimony was incredible or insubstantial.

1      The Supreme Court of the United States has never held that a statute mandating the

2 corroboration of accomplice testimony creates a liberty interest under the Due Process Clause.

3 Recently, in *Swarthout v. Cooke*, __ U.S. __, 131 S.Ct 859, 178 L.Ed.2d 732 (2011) (per

4 curiam), the Supreme Court had the opportunity to address the scope of federal habeas review

5 when a state-created liberty interest is at issue.  In that case, Cooke, a California state prisoner,

6 was challenging the State's determination that he was ineligible for parole by means of a federal

7 petition for habeas corpus.  In California, a prisoner who is eligible for parole is entitled to be

8 released unless "'some evidence' supports the conclusion that the inmate is unsuitable for parole

9 because he or she currently is dangerous."  *In re Lawrence*, 44 Cal.4th 1181, 1191, 82

10 Cal.Rptr.3d 169, 190 P.3d 535 (2008); *see also In re Shaputis*, 44 Cal.4th 1241, 1253-54, 82

11 Cal.Rptr.3d 213, 190 P.3d 573 (2008); *In re Rosenkrantz*, 29 Cal.4th 616, 625-26, 128

12 Cal.Rptr.2d 104, 59 P.3d 174 (2002).  Cooke filed a federal habeas petition alleging that

13 California's parole statute created a liberty interest protected by the Due Process Clause and that

14 the "some evidence" requirement was a component of that federally protected liberty interest.

15 *Cooke*, 131 S.Ct. at 860.  The Ninth Circuit agreed and concluded that the finding of some

16 evidence in Cooke's case was an unreasonable determination of the facts in light of the evidence.

17 *Id.* at 860-61 (citing *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010)).

18      The Supreme Court reversed the Ninth Circuit's judgment, concluding that if Cooke did,

19 in fact, have a liberty interest in parole—a determination not reviewed by the Court—federal

20 review was limited to whether Cooke received fair procedures for vindicating that right.  *Id.* at

21 861-62 ("When . . . a State creates a liberty interest, the Due Process Clause requires fair

22 procedures for its vindication—and federal courts will review the application of those

23 constitutionally required procedures.").  Thus, the only constitutional question presented when a

24 petitioner asserts a State created liberty interest is one of procedure.  It was not for a federal court

25 to determine whether the "some evidence" standard was correctly applied by the State courts.  *Id.*

26 at 862; *see also id.* at 863 ("Because the only federal right at issue is procedural, the relevant

1   inquiry is what process [was] received, not whether the state court decided the case correctly.");

2   *Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect

3   persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty,

4   or property").

5         In Petitioner's case, the trial court instructed the jury that Petitioner and Flanagan were

6   accomplices as a matter of law and that Flanagan's testimony was subject to the rule requiring

7   corroboration.  Clerk's Tr. at 465.  Petitioner does not allege that the state courts did not follow

8   California law by failing to require corroboration, but rather challenges as erroneous the finding

9   of corroboration under the facts of his case.  Under *Cooke*, federal habeas review is limited to

10  whether Petitioner was afforded an adequate opportunity to vindicate his liberty right.  Petitioner

11  received the quintessential, and most rigorous, form of procedural due process—a criminal trial

12  before a jury of his peers subject to appellate review.  *See, e.g.*, *Santosky v. Kramer*, 455 U.S.

13  745, 754-55 (1982); *Addington v. Texas*, 441 U.S. 318, 423-27 (1979) (discussing varying

14  standard of proof requirements depending on the interest at stake and concluding that the

15  reasonable doubt standard is to be used when the risk to society of error is at its highest); *I.N.S. v.*

16  *Lopez-Mendoza*, 468 U.S. 1032, 1038-44 (1984) (setting a criminal trial as the high water mark

17  for procedural due process claims).  The jury was instructed that they could not "find a defendant

18  guilty based upon the testimony of an accomplice unless the testimony is corroborated by other

19  evidence which tends to connect the defendant with the commission of the offense."  Clerk's Tr.

20  at 461.  They were further instructed as to what must be shown to corroborate such testimony

21  under California law.  *Id.* at 462; *see* CALJIC 3.12.  The jury concluded that Flanagan's

22  testimony had been amply corroborated, and that determination was upheld by the California

23  Court of Appeal.

24  / / /

25  / / /

26  / / /

1     Petitioner makes several arguments why *Cooke* does not foreclose relief on this claim.[3]

2  First, Petitioner argues that *Cooke* is limited to the context of parole hearings, and therefore has

3  no bearing on the state liberty interest in this case, relating to innocence or guilt, not parole.  A

4  careful reading of *Cooke* shows that it is applicable in all cases where a state-created liberty

5  interest is at issue.  *See Cooke*, 131 S.Ct at 862 (" When . . . a State creates a liberty interest, the

6  Due Process Clause requires fair procedures for its vindication—and federal courts will review

7  the application of those constitutionally required *procedures*." (emphasis added)); *id.* at 863

8  (requiring federal courts to review the substantive merits of a claim for violation of a state

9  created liberty interest "would subject to federal-court merits review the application of all

10  state-prescribed procedures in cases involving liberty or property interests, including (of course)

11  those in criminal prosecutions.  That has never been the law.").  It is true that the procedures

12  required may vary from case to case depending on the interest at stake.  *Compare Greenholtz v.*

13  *Inmates of Neb. Penal and Correctional Complex,* 442 U.S. 1 (1979) *with Wolff v. McDonnell*,

14  418 U.S. 539 (1974); *see also Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532 (1985).

15  However, in *Cooke* the Supreme Court stated that when a liberty interest is at issue, the only

16  inquiry for a federal court is what *procedure* is required and whether that *procedure* was

17  followed.  *Cooke*, 131 S.Ct. at 863.  Here, Petitioner makes no argument that his rights were

18  violated on any procedural basis, an argument not foreclosed by *Cooke*, but rather argues that the

19  state courts determination that the accomplice testimony was corroborated was erroneous on the

20  merits.  It is not this court's position to determine "whether the state court decided the case

21  correctly."  *Id.*

22  ///

23  ///

24

25     [3]     *Cooke* was decided after both the Answer and Traverse were filed in this case.
26  Both parties were ordered to file an additional brief addressing the potential impact of *Cooke* on
   this case.  *See* Docket No. 30.

1    Second, Petitioner argues that this court lacks the authority to "overrule" the Ninth

2    Circuit's opinion in *Laboa*.  However, when a decision of the Supreme Court is "clearly

3    irreconcilable" with the decision of an intermediate appellate court, a district court is bound to

4    follow the Supreme Court's reasoning and reject the reasoning of the Court of Appeals.  *See*

5    *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (when an intervening decision by the

6    Supreme Court is clearly irreconcilable with a circuit authority "district courts should consider

7    themselves bound by the intervening higher authority and reject the prior opinion."); *United*

8    *States v. Lindsey*, 634 F.3d 531, 548 (9th Cir. 2011).  *Cooke* states that a federal court should not

9    inquire into the underlying merits of a state courts determination regarding a state-created liberty

10   interest and that the only inquiry for a federal court is whether the state provided adequate

11   procedures to protect the interest.  To the extent the *Laboa* court's opinion reaches the

12   substantive issue of whether the accomplice's testimony was actually corroborated, it is clearly

13   irreconcilable with the *Cooke* decision.  *See Miller,* 335 F.3d at 899-900;. *Lindsey*, 634 F.3d at

14   548.  This court still remains bound by the Ninth Circuit's determination that California Penal

15   Code section 1111 creates a state liberty interest.

16   Petitioner received adequate procedures to protect his state-created liberty interest that

17   accomplice testimony be corroborated.  He is not entitled to relief on this claim.

18        2.  Claim II

19   In Claim II, Petitioner alleges that his conviction was the result of the prosecution's use of

20   inconsistent theories at two different trials stemming from the underlying robbery, murder, and

21   attempted murder.  Prior to Petitioner's trial, James Gordon, one of Petitioner's accomplices, was

22   tried for the murder of John Jarvis.  In that trial, the prosecution attempted to prove that it was

23   Gordon who shot Jarvis and Gonzales.  The state introduced testimony from a jailhouse

24   informant that Gordon had admitted to the shooting.  Clerk's Tr. at 125, 132-33.  At the

25   conclusion of Gordon's trial however, the jury returned a guilty verdict as to the murder charge,

26   but did not find true the enhancement that he personally discharged a firearm.  Rep.'s Tr. at 640,

2358.  The jury thus concluded that while Gordon was involved in the crime, he was not the man who shot the victims.  Petitioner, who was tried along with his co-defendant David Jones, was tried next.  In the interim, Flanagan had accepted a plea in exchange for his testimony against the remaining defendants.  The prosecution, through Flanagan's testimony, sought to prove that Petitioner was the man who pulled the trigger.  The jury agreed, concluding that Petitioner had personally and intentionally discharged a firearm proximately causing great bodily injury or death to Jarvis and Gonzalez.

In support of Petitioner's theory, he cites to cases from the California Supreme Court, the Ninth Circuit, and the Eighth Circuit.  Under the circumstances of this case, however, the writ of habeas corpus can only be granted where the state court unreasonably applied clearly established federal law, "as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  "Clearly established federal law 'as determined by the Supreme Court, refers to the holdings, as opposed to the dicta of [the Supreme Court's] decisions as of the time of the relevant state-court decision.'"  *Earp v. Ornoski*, 431 F.3d 1158, 1182 (9th Cir. 2005) (quoting *Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004)).  Petitioner cites to no authority from the Supreme Court where the Court has held that inconsistent theories of prosecution in separate trials violates the federal charter.  Indeed, the Court "has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."  *Bradshaw v. Stumpf*, 545 U.S. 175, 190 (2005) (Thomas, J., concurring).

In *Stumpf*, the petitioner argued that his death sentence should be reversed because the State later argued that it was his accomplice, not the petitioner, who had fired the fatal shots.  The facts of *Stumpf* are not significantly distinguishable from the present case:

> At the hearing on Stumpf's sentence, the State argued that he was the triggerman, and it urged consideration of that fact as a reason to impose a death sentence.  The trial court found that Stumpf pulled the trigger and did sentence him to death, though it did not state that finding Stumpf to be the shooter was dispositive in determining the sentence.  After the sentencing proceeding was over, the State tried the codefendant, Wesley, and on the basis of

15

testimony from a new witness argued that Wesley was in fact the triggerman and should be sentenced to death.  The new witness was apparently unconvincing to the jury, which in any event was informed that Stumpf had already been sentenced to death for the crime; the jury rejected the specification that named Wesley as the triggerman, and it recommended a sentence of life, not death.  Stumpf then challenged his death sentence (along with his conviction) on the basis of the prosecution's position in the Wesley case.  In response, the State did not repudiate the position it had taken in the codefendant's case, or explain that it had made a mistake there.  Instead, it merely dismissed the testimony of the witness it had vouched for at Wesley's trial and maintained that Stumpf's death sentence should stand for some or all of the reasons it originally argued for its imposition.  At the end of the day, the State was on record as maintaining that Stumpf and Wesley should both be executed on the ground that each was the triggerman, when it was undisputed that only one of them could have been.

*Id.* at 188 (Souter, J., concurring) (citations omitted).  For various procedural reasons, a unanimous Court determined that it was premature to resolve the merits of Stumpf's inconsistent theory claim.  *Id.* at 187.  The Court, therefore, "express[ed] no opinion on whether the prosecutor's actions amounted to a due process violation."  *Id.*

On remand, the Sixth Circuit determined that the use of inconsistent theories violated due process.  *Stumpf v. Houk*, ___ F.3d ___, 2011 WL 3506101, at *9 (6th Cir. August 11, 2011).  In doing so, the Sixth Circuit concurred with the judgment of several courts on which Petitioner relies, including: the California Supreme Court's decision in *In re Sakarias*, 35 Cal.4th 140, 25 Cal.Rptr.3d 265, 106 P.3d 931, 944 (2005) (The "use of irreconcilable theories of . . . culpability, unjustified by a good faith justification for the inconsistency, is fundamentally unfair, for it necessarily creates the potential for—and, where prejudicial, actually achieves—. . . increased punishment on a false factual basis for one of the accuseds."); the Eight Circuit's opinion in *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000); and, the Ninth Circuit's opinion in *Thompson v. Calderon*, 120 F.3d 1045, 1059 (9th Cir. 1997) (en banc), *vacated on other grounds*, 523 U.S. 538 (1998).  *Stumpf*, 2011 WL 3506101, at *7.

/ / /

/ / /

16

1    Unlike Petitioner's case, however, Stumpf's federal habeas petition was governed by pre-

2    AEDPA principles, *Stumpf*, 545 U.S. at 182, allowing the circuit court to grant relief without the

3    Supreme Court having clearly determined the issue.  As discussed above, under AEDPA

4    Petitioner can only be granted relief if the state court unreasonably applied federal law, as

5    determined by the Supreme Court of the United States.  The Supreme Court is yet to address

6    whether the use of inconsistent theories by the prosecution violates due process.  *Id.* at 187; *see*

7    *also Fotopoulos v. Sec'y, Dep't of Corr.*, 516 F.3d 1229 (11th Cir. 2008), *cert. denied* __ U.S.

8    __, 129 S.Ct. 217, 172 L.Ed.2d 171 (2008) (concluding that in light of *Stumpf*, there is no

9    Supreme Court authority clearly establishing that use of inconsistent theories of prosecution

10   violates due process).  As such, Petitioner is not entitled to relief on this claim.

11       3.  Claim III

12       In Claim III, Petitioner alleges that the admission of evidence of his past crimes violated

13   his right to due process.  Petitioner's claim stems from the testimony of a prosecution witness,

14   Nicole Inacio, a DNA technician with California Department of Justice.  At trial, Inacio testified

15   that she had discovered Petitioner's DNA on several pieces of evidence found in Flanagan's car.

16   Rep.'s Tr. at 1861.  Inacio also determined that a blood stain in the back seat of the car matched

17   Petitioner's DNA.  In discussing how she matched Petitioner's DNA, Inacio stated—over

18   Petitioner's objection—that a sample of Petitioner's DNA matched samples in both the state and

19   national DNA databases.  Petitioner claimed that allowing Inacio to testify about the database

20   matches was akin to telling the jury that Petitioner had been involved in previous crimes and had

21   prior felony arrests or convictions.  Purportedly, this permitted the jury to conclude Petitioner's

22   guilt based on his propensity for crime, rather than upon the facts of the case.

23       To support his position that the admission of past crimes evidence amounts to a violation

24   of due process, Petitioner relies upon *McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993).

25   In *McKinney*, the Ninth Circuit determined it violated due process to admit "other acts" evidence

26   that was wholly irrelevant other than as character evidence to show the defendant acted in

17

1   conformity therewith.  *Id.*  That was, however, before Congress enacted AEDPA, which, as

2   discussed above, limits the grant of habeas corpus to cases where the state court unreasonably

3   applied clearly established federal law, "as determined by the Supreme Court of the United

4   States."  28 U.S.C. § 2254(d)(1); *see Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006).  In

5   *Alberni*, the Ninth Circuit determined that after the enaction of AEDPA, *McKinney* no longer

6   presented a basis for granting federal habeas relief.  458 F.3d at 864.

7         In *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991), the Supreme Court expressly refused

8   to determine whether the introduction of prior crimes evidence to show propensity to commit a

9   crime would violate the Due Process Clause.[4]  *See also Alberni*, 458 F.3d at 864, 866 ("*Estelle*

10  expressly left this issue an 'open question'").  Thus, as with Claim II, Petitioner lacks the

11  necessary clearly established federal law, as determined by the Supreme Court of the United

12  States, to support his claim.  *Id.* ("when the Supreme Court has expressly reserved consideration

13  of an issue . . . the petitioner cannot rely on circuit authority to demonstrate that the right he or

14  she seeks to vindicate is clearly established" (citing *Earp*, 431 F.3d at 1184-85)); *accord Mejia v.*

15  *Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008).  Petitioner is not entitled to relief.

16        4.  Claim IV

17        This Claim challenges the trial court's jury instructions, specifically the instruction with

18  regard to flight.  At Petitioner's trial, the jury was instructed in accordance with California's

19  standard instruction on evidence of flight, CALJIC No. 2.52: "The flight of a person immediately

20  after the commission of a crime, or after he is accused of a crime, is not sufficient by itself to

21  establish his guilt, but is a fact which, if proved, may be considered by you in light of all other

22  proved facts in deciding whether a defendant is guilty or not guilty.  The weight to which this

23  circumstance is entitled is a matter for you to decide."  Petitioner alleges that this instruction

24  ────────────────

25        [4]      The Supreme Court concluded: "Because we need not reach the issue, we express
     no opinion on whether a state law would violate the Due Process Clause if it permitted the use of
26  'prior crimes' evidence to show propensity to commit a charged crime."  *McGuire*, 502 U.S. at
     72 n. 5.

violates due process because there was no evidence of flight.

In ruling on Petitioner's claim, the California Court of Appeal stated as follows:

> Steven contends there was insufficient evidence to support a flight instruction because the evidence did not show he fled immediately following the crime or after having been accused of the crime. Respondent argues that the evidence required giving a flight instruction. Respondent is correct.

> Steven's defense counsel objected to the giving of CALJIC No. 2.52, the standard jury instruction on evidence of flight. He argued that it should not be given because the evidence that Steven had been in New York and Nevada was admitted for a limited non-hearsay purpose and therefore could not be considered evidence of flight. The prosecutor argued the instruction should be given because defendants fled the scene of the crime, dumped the car, and took off. The trial court agreed and ruled that the instruction would be given on the "flight of a person immediately after the commission of a crime" and that it would strike out "attempted escape from custody."

> The trial court instructed the jury in accordance with CALJIC No. 2.52 as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient by itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

> "Whenever the prosecution relies on evidence of flight as tending to show a defendant's guilt, the trial court must instruct the jury" in the language of section 1127c. (*People v. Jurado* (2006) 38 Cal.4th 72, 126.) FN8 CALJIC No. 2.52 is derived from and tracks the language of section 1127c. (*People v. Albilez* (2007) 41 Cal.4th 472, 521.) "In this context, flight 'requires neither the physical act of running nor the reaching of a faraway haven' but it does require 'a purpose to avoid being observed or arrested.' [Citations.]" (*People v. Jurado, supra*, 38 Cal.4th at p. 126.) Thus, CALJIC No. 2.52 should be given when the evidence shows the accused departed the crime scene under circumstances suggesting his departure was motivated by a consciousness of guilt, such as leaving the crime scene in haste. (*People v. Turner* (1990) 50 Cal.3d 668, 695; *People v. Albilez, supra*, 41 Cal.4th at p. 568.)

> > FN8. Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows:

> The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.
>
> No further instruction on the subject of flight need be given."

> Here the evidence showed Steven fled the crime scene immediately after shooting Jarvis and Gonzales and did so under circumstances suggesting a consciousness of guilt. After firing five gunshots into Jarvis's truck, he briskly returned to the Taurus, telling his confederates, "Get me out of here. Get me out of here. Please get me out of here." Gordon immediately drove away from the scene of the shooting. After Gordon refused to drive any further, Steven took the wheel and sped past the crime scene in the other direction. After one of the tires on the Taurus went flat, he pulled into a small turn-out in the road, where he and David dumped the Taurus over an embankment, and fled with the marijuana. He had left the crime scene as quickly as possible and by his own words evinced an intent to evade law enforcement officials. It was therefore proper for the trial court to give the flight instruction.

Slip Op. at 23-25.

A faulty jury instruction will constitute a violation of due process only where the instruction by itself so infected the entire trial that the resulting conviction violates due process. *Middleton v. McNeil*, 541 U.S. 433, 437 (2004); *McGuire*, 502 U.S. at 71-72.  The instruction must be more than merely erroneous; petitioner must show there was a "'reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.'" *McNeil*, 541 U.S. at 437 (citations omitted); *Boyde v. California*, 494 U.S. 370, 380 (1990); *see also Cupp v. Naughten*, 414 U.S. 141, 146 (1973).  Further, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *McGuire*, 502 U.S. at 72 (citation omitted); *Naughten*, 414 U.S. at 147.  Under most circumstances, an instruction that violates the Constitution does not warrant habeas relief unless the "error 'had substantial and injurious effect

1  or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623

2  (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

3      Petitioner argues that "[g]iving the flight instruction implied that the court believed that

4  there was evidence to support it." Pet. at m-13.  To the contrary, the instruction clearly informed

5  the jury that it was for the jury to decide whether Petitioner had fled and, if so, what weight to

6  give it. *See McMillan v.Gomez*, 19 F.3d 465, 469 (9th Cir. 1994) ("The jury was expressly

7  instructed that defendant's flight was evidence of guilt only if defendant's flight were proved.").

8  Petitioner's jury was also read an instruction that "whether some instructions apply will depend

9  upon what you find to be the facts," Clerk's Tr. at 554, further indicating to the jury that a

10  particular instruction may or may not apply to the case based upon how the jury determined the

11  facts.  Moreover, any instruction given by a judge necessarily implies that it is possibly, though

12  not certainly, applicable to the case before the jury.  Judges do not give the jury instructions on

13  the definition of murder in an assault case.  But just because a instruction is given does not mean

14  that the judge believes the evidence supports it.  For instance, when a judge offers an instruction

15  on a lesser included offense this does not imply that the judge believes the defendant is not guilty

16  of the charged crime.  Nor does the giving of a reasonable doubt instruction mean that the judge

17  believes the prosecution has met its burden of proving its case.  Petitioner's contention would

18  render most jury instructions unconstitutional.

19      Furthermore, sufficient evidence was presented at Petitioner's trial to warrant the flight

20  instruction.  Petitioner's claim rests on the shoulders of Claim I as he argues that the only

21  evidence of flight was through his accomplice's uncorroborated testimony.  As discussed above,

22  the trier of fact concluded that Flanagan's testimony was corroborated, a decision that is not to be

23  disturbed by this court, and, as such, his testimony is capable of supporting a flight instruction.

24  Petitioner does not dispute that Flanagan's testimony warranted a flight instruction. Pet. at m-13

25  ("there was no evidence of flight *except for Flangan's testimony*" (emphasis added)).  Flanagan

26  testified that after Petitioner shot Jarvis and Gonzales he returned to the car, urging his

companions to "Get me out of here.  Get me out of here.  Please get me out of here."  Rep.'s Tr.

at 1226.  They then drove away from the scene of the shooting.  *Id.*  Later, Petitioner and his co-

defendant pushed the car they had been using off a cliff and disappeared.  *Id.* at 1323-24.  This all

indicates an attempt to flee from the scene of the crime and provides support for the use of the

flight instruction.  Under these circumstances, a flight instruction does not violate due process.

*See Gomez*, 19 F.3d at 469 (flight instruction not improper where prosecution made "strong

showing" that it was petitioner who left scene of crime).

Lastly, Petitioner cannot show that he was prejudiced by the given instruction.  CALJIC

2.52 is a protective instruction, designed to inform the jury that they cannot infer guilt from the

defendant's actions after the crime.  The instruction helped, not hindered, Petitioner and, as such,

he did not suffer prejudice.  *See Karis v. Calderon*, 283 F.3d 1117, 1132 (9th Cir. 2002); *Brecht*,

507 U.S. at 623.

For all the above reasons, the California Court of Appeal reached a reasonable

determination when it concluded that Petitioner's trial was not rendered fundamentally unfair as

a result of the flight instruction.  Petitioner is not entitled to relief on this claim.

5. Claim V

In his fifth and final claim, Petitioner asserts that his trial counsel provided ineffective

assistance when he failed to challenge the potential admissibility of Gordon's previous testimony

that Petitioner was the shooter.  At Gordon's trial, Michael Waxler, a prisoner who had been in

jail with Gordon, testified that Gordon had confessed the crime to him.  Gordon denied making

such statements and, instead, alluded to the fact that Petitioner was the shooter.  At Petitioner's

trial, Petitioner's counsel sought to introduce Waxler's testimony that Gordon had confessed to

the crime, either through Waxler's in court testimony or through the introduction of his previous

testimony at Gordon's trial.  The trial court ruled that if Waxler's testimony regarding Gordon's

confession was admitted, the prosecution would be permitted to introduce Gordon's previous

trial testimony that denied or contradicted Waxler's.  Petitioner contends, and it is now

22

undisputed that, Gordon's previous testimony would have been inadmissible under the

Confrontation Clause.  Petitioner further alleges that his counsel's failure to object on

Confrontation Clause grounds and his decision thereafter not to call Waxler as a witness amount

to ineffective assistance of counsel which prejudicially effected the outcome of his trial.

In ruling on this Claim, the California Court of Appeal stated as follows:[5]

> At James Gordon's separate trial, Michael Waxler testified that Gordon had admitted to him that he shot Jarvis. At Steven's trial below, Steven's counsel proposed to call Waxler as a witness, or in the event he was unavailable, he sought to introduce Waxler's prior testimony. Counsel argued that Gordon's hearsay statement to Waxler was admissible as a declaration against penal interests, but that any other part of Gordon's statement to Waxler was inadmissible. The prosecutor argued that if Waxler's live or prior testimony was admitted, the People should be allowed to impeach his testimony by introducing Gordon's prior trial testimony identifying Steven as the shooter.FN10

>> FN10. The court found Gordon was unavailable to testify as a witness in this case.

> Because Waxler had not appeared as scheduled, there was a great deal of discussion about whether his prior testimony could be introduced. The trial court ruled as follows: "Since this morning I did look at [Evidence Code sections] 356 [ FN11] and 1202 again, my ruling will be that Mr. Waxler testifies. Or if his statement comes in by way of his transcript from the prior hearing, I will allow the People to bring in Mr. Gordon's testimony and each and every aspect that denies or contradicts what Mr. Waxler stated Mr. Gordon told him. And that will include, for impeachment purposes, the allegation by Mr. Gordon that Steve O. was the shooter, because that is inconsistent with what was stated on previous occasions." (Italics added.)

>> FN11. Evidence Code section 356 states: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration,

---

[5]     Petitioner also raised this claim in state habeas proceedings.  However, the courts reviewing the petition did not reach the merits of his claim, concluding that it had already been raised on direct appeal.  *See* Lodged Doc. Nos. 9 & 11.  As such, the decision of the Court of Appeal on direct appeal represents the last reasoned decision with regard to this ineffective assistance of counsel claim.

> conversation, or writing is given in evidence, any
> other act, declaration, conversation, or writing
> which is necessary to make it understood may also
> be given in evidence."

Defense counsel told the court that in light of its ruling he would not call Waxler as a witness. Shortly thereafter, Waxler appeared in court and was immediately released.

On appeal, Steven claims he was denied the effective assistance of counsel because counsel failed to object to the admission of James Gordon's prior testimony as inadmissible hearsay under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*) and that this failure resulted in counsel's decision not to call Waxler as a witness. Respondent argues Steven cannot show deficient performance or prejudice.

Steven's claim fails for lack of prejudice because the record establishes that counsel's failure to raise a Crawford objection had no bearing on his decision not to call Waxler as a witness.

To establish a denial of his right to the effective assistance of counsel, defendant must establish that counsel's performance was deficient and that he was prejudiced thereby. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] (*Strickland*).) To prove the first prong, Steven must prove counsel's "representation fell below an objective standard of reasonableness .... [¶] ... under prevailing professional norms." (*Strickland*, *supra*, 466 U.S. at pp. 687-688 [80 L.Ed.2d at pp. 693-694].) To demonstrate the prejudice prong, Steven must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694 [at p. 698].)

In considering this claim, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697 [80 L.Ed.2d at p. 699].)

Steven argues that if counsel had objected to the proposed evidence of Gordon's prior testimony under Crawford, the trial court would have ruled the evidence inadmissible and then counsel could have presented Waxler's testimony without the risk of impeachment by Gordon's prior testimony. We disagree.

Although Steven correctly asserts that Gordon's prior testimony was inadmissible under Crawford and respondent concedes as

much,FN12 he is incorrect in concluding that counsel's decision not to call Waxler was a direct result of that failure. The trial court ruled that Gordon's prior testimony was admissible only "if" Waxler did not appear, in which case "his statement comes in by way of his transcript from the prior hearing...." Prior testimony is admissible only if the declarant is unavailable. (Evid.Code, § 1291, subd. (a).) Since Waxler ultimately appeared in court, he was available, leaving Gordon's prior testimony inadmissible. Consequently, defense counsel could have called Waxler as a witness without being impeached with Gordon's prior testimony. Nevertheless, he chose not to call Waxler, presumably concluding that the risk of impeachment by cross-examination was just as great or greater than the risk of impeachment with prior testimony.

> FN12. Respondent concedes that Gordon's prior testimony is inadmissible under *Crawford*. We agree. In *Crawford*, the United States Supreme Court held that under the confrontation clause, testimonial statements made by a witness who does not appear at trial are not admissible unless the declarant was unavailable at trial and the defendant had a prior opportunity to cross-examine the declarant. (*Crawford, supra*, 541 U.S. at pp. 53-54 [158 L.Ed.2d at p. 194].) Since Steven did not have a prior opportunity to cross-examine Gordon, he correctly asserts on appeal that Gordon's prior testimony was inadmissible under the holding in *Crawford*.

We therefore conclude counsel's failure to object to the proffered evidence under *Crawford* had no prejudicial effect and therefore reject Steven's ineffective assistance claim.

Slip Op. at 35-39.

The Court of Appeal's decision represents an unreasonable determination of the facts in light of the trial record. *See* 28 U.S.C. § 2254(d)(2). In essence, the Court of Appeal's determination that Petitioner did not suffer prejudice relies on the fact that Waxler was available to testify and the trial court would only have allowed Gordon's previous testimony had Waxler been unavailable and his previous testimony read into evidence. *See* Slip Op. at 39 ("Since Waxler ultimately appeared in court, he was available, leaving Gordon's prior testimony inadmissible. Consequently, defense counsel could have called Waxler as a witness without being impeached with Gordon's prior testimony."). As the Court of Appeal's own rendition of

1   the facts indicates, however,  that is not how the trial court ruled.  To the contrary, the trial court

2   ruled that if evidence of Gordon's alleged confession to Waxler was admitted, either through

3   Waxler's present or prior testimony, Gordon's prior testimony would be admissible to the extent

4   that it contradicted or denied Waxler's testimony.  The trial court stated:

5               my ruling will be that Mr. Waxler testifies. Or if his statement
                comes in by way of his transcript from the prior hearing, I will
6               allow the People to bring in Mr. Gordon's testimony and each and
                every aspect that denies or contradicts what Mr. Waxler stated Mr.
7               Gordon told him. And that will include, for impeachment purposes,
                the allegation by Mr. Gordon that Steve O was the shooter, because
8               that is inconsistent with what was stated on previous occasions.

9   Rep.'s Tr. at 2263.

10          While the transcript is somewhat ambiguous, a review of the surrounding record and the

11  response of counsel indicates that the judge meant that if Waxler testified then Gordon's prior

12  trial testimony would be allowed into evidence.[6]  As such, the Court of Appeal reached an

13  unreasonable determination of the facts and this court reviews Petitioner's ineffective assistance

14  of counsel claim *de novo*.  *See Taylor v. Maddox*, 366 F.3d 992, 1008 (9th Cir. 2004) ("When we

15  determine that state-court fact-finding is unreasonable, . . . we have an obligation to set those

16  findings aside . . . ."); *see also Panetti v. Quarterman*, 551 U.S. 930 (2007) (declining to apply

17  AEDPA deference when state court made unreasonable determination of law under 28 U.S.C. §

18  2254(d)(1)).

19          Reviewing Petitioner's claim *de novo*, it fails because he cannot show that he was

20  prejudiced by the failure to object on Confrontation Clause grounds.  This is not because

21  Gordon's testimony was inadmissible if Waxler testified, as the California Court of Appeal

22

23          [6]      The record in this case is replete with recording errors, which can be best
24  reviewed by looking to the context of the statements.  For instance, the record reflects that
    Gonzales testified that he "left out some important dials [sic] about" his father, where it is clear
25  that Gonzales said "details."  Rep.'s Tr. at 841.  As to the judge's statement regarding the
    admission of Gordon's testimony, he most likely said: "my ruling will be that *if* Mr. Waxler
26  testifies or if his statement comes in by way of his transcript comes in by way of the prior
    hearing, I will allow the People to bring in Mr. Gordon's testimony."

1    determined, but because even if Waxler had testified without the admission of Gordon's

2    testimony the result of the proceedings was not likely to be different.

3         The Sixth Amendment guarantees effective assistance of counsel.  In *Strickland v.*

4    *Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating

5    ineffective assistance of counsel.  First, the petitioner must show that considering all the

6    circumstances, counsel's performance fell below an objective standard of reasonableness.  *See id.*

7    at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result

8    of reasonable professional judgment.  *See id.* at 690.  The federal court must then determine

9    whether in light of all the circumstances, the identified acts or omissions were outside the range

10   of professional competent assistance.  *See id.*

11        Second, a petitioner must affirmatively prove prejudice.  *See id.* at 693.  Prejudice is

12   found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

13   result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a

14   probability sufficient to undermine the confidence in the outcome."  *Id.*  A reviewing court "need

15   not determine whether counsel's performance was deficient before examining the prejudice

16   suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

17   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

18   followed."  *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at

19   697).

20        At Petitioner's trial he had several opportunities to place into doubt the fact that he was

21   present during the commission of the underlying offenses.  Gonzales, who was shot twice in the

22   back, said that he saw a black male pull a gun out of the trunk of the Taurus and shoot at Jarvis'

23   truck from a distance of three to four feet.  Rep.'s Tr. at 834.  However, Gonzales could not

24   identify Petitioner as the gunman or as being one of the four men in the car.  *Id.* at 855-58.  In

25   fact, Gonzales had initially recognized another man seen in pictures developed from film found

26   in the Taurus as the fourth person in the car on the day of the murder—a fact that was seized

1  upon during cross-examination. *Id.* at 860-62, 895-96.  Furthermore, Petitioner introduced the

2  testimony of Steven Raines, who lived in the same pod as Flanagan in jail. *Id.* at 2238.  Raines

3  testified that Flanagan had told him three or four times that Petitioner was not present at the

4  robbery and that Flanagan had set him up to be a "fall guy." *Id.* at 2239.  Flanagan testified that

5  he had never made such statements. *Id.* at 2230.  Lastly, Petitioner introduced evidence of an

6  alibi that he was at an anger management class in Richmond, California the day after the

7  shooting.  Considering Petitioner allegedly left the scene of the crime on foot, he contended it

8  was impossible for him to be in Richmond the next day.

9      The evidence presented in Petitioner's defense was weighed against strong evidence that

10  he was a participant in the crime.  Petitioner's DNA was found on several items found in the car

11  and matched a blood stain on the back seat.  Flanagan gave detailed testimony regarding

12  Petitioner's involvement in the crime, including the fact that Petitioner was the gunman.

13      Petitioner claims that had the additional testimony of Waxler, another jailhouse

14  informant, been given to the jury, there is a reasonable probability that the outcome of the

15  proceeding would have been different. *See Strickland*, 466 U.S. at 694.  A review of the record

16  shows that Waxler's testimony would have been largely cumulative to the testimony of Raines.

17  Raines' testimony was in fact more probative as it called into question the credibility of the

18  prosecution's only witness who identified Petitioner as the gunman, Flanagan.[7]  Considering the

19  strong evidence against Petitioner and that Petitioner had already tried, unsuccessfully, to

20  establish that he was not involved in the crime it is unlikely and improbable that Waxler's

21  additional testimony would have changed the outcome of the proceedings. *Cf. Wiggins v. Smith*,

22  539 U.S. 510, 536 (2003) (considerable new evidence created a reasonable probability that the

23  result would have been different).  As such, Petitioner has not met his burden on this ineffective

24  ――――――――――――――

25      [7]      While it is impossible for this court to judge Waxler's credibility, it is of note that
    the testimony of jailhouse informants is often mendacious.  Moreover, the jury in Gordon's trial
26  found Waxler's testimony to be incredible, concluding Gordon was not the shooter when Waxler
    had testified that Gordon had confessed to him he was the gunman.

1   assistance of counsel claim.  The claim should be denied.

2   ## IV.  REQUEST FOR AN EVIDENTIARY HEARING

3    Finally, Petitioner requests an evidentiary hearing on his Claims.  Pet. at 20.  A court

4   presented with a request for an evidentiary hearing must first determine whether a factual basis

5   exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing

6   "might be appropriate."  *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999); *see also Earp*

7   *v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing

8   must also demonstrate that he has presented a "colorable claim for relief."  *Earp*, 431 F.3d at

9   1167 (citations omitted).  To show that a claim is "colorable," a petitioner is "required to allege

10  specific facts which, if true, would entitle him to relief."  *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th

11  Cir. 1998) (internal quotation marks and citation omitted).  In this case, Petitioner's claims are

12  readily determined by the record.  Petitioner has not alleged any additional facts that, if true,

13  would entitle him to relief and, therefore, Petitioner fails to demonstrate that he has a colorable

14  claim for federal habeas relief.  Moreover, the Supreme Court has recently held that federal

15  habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state

16  court that adjudicated the claim on the merits" and "that evidence introduced in federal court has

17  no bearing on" such review.  *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398, 1400

18  (2011).  Thus, his request will be denied.

19  ## V.  CONCLUSION

20   Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an evidentiary

21  hearing is DENIED.

22   For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for

23  writ of habeas corpus be DENIED.

24   These findings and recommendations are submitted to the United States District Judge

25  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

26  after being served with these findings and recommendations, any party may file written objections

1    with the court and serve a copy on all parties.  Such a document should be captioned "Objections

2    to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be

3    served and filed within seven days after service of the objections.  The parties are advised that

4    failure to file objections within the specified time may waive the right to appeal the District

5    Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file,

6    Petitioner may address whether a certificate of appealability should issue in the event he elects to

7    file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254

8    Cases (the district court must issue or deny a certificate of appealability when it enters a final

9    order adverse to the applicant).

10    DATED:  March 15, 2012

16               TIMOTHY J BOMMER
               UNITED STATES MAGISTRATE JUDGE